**COBB PUBLISHING, INC., and Joseph T. Cobb, Plaintiffs,**

v.

**HEARST CORPORATION, and Dow Jones & Co., Defendants.**

**No. 93–CV–71771–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 31, 1995.

---

Mark Cantor, Ernie L. Brooks, Southfield, MI, for plaintiffs.

Marjory G. Basile, Gregory L. Curtner, Michael Fayz, Detroit, MI, for defendants.

*OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR DISQUALIFICATION OF DEFENSE COUNSEL*

BORMAN, District Judge.

**I.  *Introduction***

On April 28, 1993, Plaintiffs Cobb Publishing, Inc. and Joseph T. Cobb (hereinafter

Cobb), by their attorneys, Brooks and Kushman (hereinafter BK), filed suit charging Defendants Hearst Corporation, and Dow Jones and Co., with, *inter alia,* violation of copyright protection laws, and breach of contract. Defendants Hearst and Dow Jones retained the law firm of Miller, Canfield, Paddock and Stone (hereinafter MC) to represent them. The case was assigned to Chief Judge Julian Abele Cook, Jr.

On August 22, 1994, Plaintiff Cobb filed a Motion to Disqualify Defendants' Counsel as a result of MC's hiring of BK attorney Steven Cohen on August 8, 1994, during the pendency of this litigation.  On September 7, 1994, this case was reassigned from Chief Judge Cook to the undersigned Judge.  On October 27, 1994, this Court held an evidentiary hearing on Plaintiff's Motion to Disqualify, at which Cohen, and MC attorney Marjorie Basile testified.

Plaintiff Cobb was initially represented by three BK attorneys: Ernest Brooks, Mark Cantor, and Cohen.  Cohen spent the greatest amount of time on the case, approximately 300 hours, and had an extensive amount of contact with Plaintiff Cobb.  (Cantor, October 27, 1994 Hearing ((hereinafter Hearing)) TR.5); (Cohen, Hearing TR.45).[1]  Cobb continues to be represented by Brooks and Cantor of BK.

Defendants Hearst and Dow Jones have been represented by three MC attorneys: Gregory Curtner, Marjorie Basile, and Michael Fayz.  Messrs. Curtner and Fayz practice in MC's commercial litigation group; Ms. Basile's expertise is in intellectual property.

**II.  *Issue for Decision***

The principal issue before the Court is whether to disqualify MC from further representation of defendants.  This requires the application of Sixth Circuit precedent, and Michigan Rule of Professional Conduct 1.10(b) (hereinafter MRPC 1.10(b)), which has been adopted by the Federal District

---

1.  Mr. Cohen's significant involvement at BK on the *Cobb* case is also noted in Plaintiff's Reply Brief filed on September 20, 1994, Page 2, and in its Supplemental Brief filed on October 4, 1994, Page 2, and has never been disputed by MC.

The MC pleadings stated that Cohen spent over 300 hours on the case, signed 27 pleadings, attended all the depositions, was the addressee on 55 letters sent by MC to BK, and sent out 74 letters in this case.

Court for the Eastern District of Michigan, Local Rule 111.1(d). MRPC 1.10(b) states in pertinent part:

*Rule 1.10 Imputed Disqualification: General Rule.*

.    .    .    .    .

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same ... matter in which that lawyer, or a firm with which the lawyer was associated, is disqualified under Rule 1.9(b) unless:

(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and,

(2) written notice is promptly given to the appropriate tribunal to enable it to ascertain compliance with the provisions of this rule.

### III. *Material Facts*

On June 23, 1994, BK attorney Steven Cohen sent a letter seeking employment to Ms. Keitha Vanderkloot, MC's recruiting coordinator. (Cohen, Hearing, TR.44). Cohen did not inform BK or Plaintiff Cobb of his interest in employment at MC (*Id.*).

During the first week of July, 1994, Vanderkloot and Cohen, by phone, discussed his coming to interview at MC. During that conversation, Cohen specifically informed Vanderkloot, "the recruiting coordinator that I was working on a case [in] which [MC's] Mr. Curtner and Mr. Fayz were defense counsel." (Cohen, Hearing, TR.44–46).

Cohen first interviewed at MC on July 22, 1994, and had a second interview on July 29, 1994. Cohen testified that he did not believe he raised the conflict issue at the first interview, but as to the second interview, stated, "I seem to recall I may have raised it, but I can't be sure." (Cohen, Hearing, TR.47). None of the three MC attorneys involved in the instant case, Curtner, Fayz or Basile,

were aware, at that time, of Cohen's communications with Vanderkloot, or of his two employment interviews at MC.

On August 3, 1994, after consultation between the Chair of MC's Public Finance Group, Joel Piell, and its Hiring Principal, Thomas Parachini, the firm mailed to Cohen an offer of employment in its Public Finance Group. (Affidavit of Keitha Vanderkloot, October 4, 1994, P. 3.)

On Monday, August 8, 1994, Cohen called Vanderkloot to accept the MC offer, and informed Cantor of BK of his intention to join MC. On August 12, 1994, Cohen terminated his employment at BK (Cohen, Hearing, TR.48).

On August 12, 1994, Cohen's last day of employment at BK, MC attorney Basile phoned him at BK to discuss a different federal case in which BK and MC were also representing the plaintiffs and defendants, respectively, *Advance Watch Co. v. American Licensing Group,* 94–CV–71069. Cohen informed Basile that he couldn't talk to her because he was joining the MC firm "starting next week." (Basile, Hearing, TR.66;[2] Cohen, Hearing, TR.55).

On August 15, 1994, Cohen began employment with MC in the Public Finance Group. MC did not utilize an intake interview procedure or debriefing to determine potential conflicts of interest (Cohen, Hearing, TR.54–55). Cohen testified that the first time anyone from MC talked to him "about the possible conflict on the Cobb case" was "two to three weeks after my starting date," when he received a phone call from Parachini, MC's Hiring Principal. (Cohen, Hearing, TR.48).

On August 16, 1994, Chief Judge Cook held a motion hearing in *Cobb v. Hearst;* Cohen was not in attendance. The issue of Cohen's transfer from BK to MC was not raised by either party.[3] Curtner stated at the instant hearing, that he first learned from Ms. Basile "that Steven [Cohen] now works for us", as he was leaving that August

---

**2.** Basile testified that this was "the third communication that I had with him on this other matter." (Basile, Hearing, TR.66)

**3.** Plaintiff Cobb was unaware of Cohen's move until August 16, 1994. BK attorney Mark Cantor

told Cohen that neither should tell Mr. Cobb that Cohen was leaving BK. Cobb did not learn about Cohen's move until after the August 16, 1994, hearing before Chief Judge Cook. (Cohen Hearing, P.61).

16th hearing (Curtner, Hearing, TR. 18). Ms. Basile testified that she first realized that Cohen had changed employment, after that August 16th hearing when MC Attorney Fayz said that Cohen "took a position with the [MC] public law department, and Greg [Curtner] looked at me and said, did you know that, and I said, I know he started with the firm this week because he told me that last week when talking to him on another matter." (Basile, Hearing, TR.67–68). Curtner stated at the instant hearing, that he "immediately said [to Basile and Fayz], don't talk to him, none of you are to talk to him" (Curtner, Hearing, TR.9), and "instructed Fayz to get a copy of the rules to check it." (Curtner, Hearing, TR. 18).

On August 18, 1994, three days after Cohen had begun practicing at MC, MC's Fayz mailed a *Cobb v. Hearst* pleading to BK, listing Cohen as the BK attorney upon whom service was made. (MC Supplemental Response, Oct. 4, 1994, p. 6)

On August 22, 1994, the instant Plaintiff's Motion for Disqualification, which had been mailed to the Federal District Court on August 19, 1994, was received and filed by the Court.

On August 26, 1994, MC's Parachini, sent out a "Notice: Chinese Wall" e-mail to all MC staff regarding Steven Cohen's joining the firm. (Curtner, Hearing, TR. 19).

On August 31, 1994, Parachini, as MC's Hiring Principal, sent a letter (ATTACHMENT I) to Chief Judge Cook notifying him, pursuant to MRPC 1.10 of MC's hiring of Cohen, and attaching a copy of MC's August 26, 1994 Chinese Wall Notice (ATTACHMENT II).

Curtner provided the following explanation for the delay from August 16th, when he first learned of Cohen's hiring, until MC's August 26th Chinese Wall E-mail:

> [T]he reason for that was that it took us that long to check the rule, and I also attempted to communicate with Mr. Piell, who is the chair of the public law group, to ascertain the facts from him regarding the employment of Mr. Cohen, and Mr. Piell was on vacation, and I also had to do the communicating through channels. I didn't

want to speak to Mr. Cohen directly. (Curtner, Hearing, TR.19).

Curtner stated that the August 31st letter to Chief Judge Cook came from Parachini, rather than himself, because "I asked him to take charge of things because I thought that was the most appropriate thing to do as head of recruiting." (Curtner, Hearing, TR.20). Curtner further stated:

> [I]t is reasonable to assume that Ms. Vanderkloot kept him [Parachini] generally apprised, and it is accurate that he knows before an offer is made. (Curtner, Hearing, TR.14).

Based upon the preceding information, this Court finds the following facts:

(1) Cohen, while at BK, had extensive involvement in the representation of, and direct contact with Plaintiff Cobb regarding the identical case presently before this Court. Accordingly, there is a substantial relationship between the subject matter of Cohen's prior representation of Plaintiff Cobb and MC's present representation of Hearst Corporation and Dow Jones.

(2) During the first week of July 1994, Cohen informed Vanderkloot, MC's recruiting coordinator, that his practice at BK created a conflict of interest since MC represented an adversary party on a case.

(3) No comprehensive firm-wide screen or wall was erected at MC and noticed to all MC attorneys and staff when Cohen was hired on August 8, 1994.

(4) No such MC screen or wall was erected and noticed on August 12th, when Cohen told MC attorney Basile that he couldn't talk to her because he was joining MC.

(5) No such MC screen or wall was erected and noticed on August 15th when Cohen began work at MC.

(6) MC did not conduct an intake interview of Cohen to determine conflicts of interest, prior to, or when he began work there on August 15, 1994.

(7) MC did not notify Chief Judge Cook, pursuant to MRPC 1.10(b)(2), prior to or at the *Cobb v. Hearst* hearing on August 16, 1994.

(8) No such MC screen or wall had been erected and noticed on August 16, 1994, when MC attorneys appeared before Chief Judge Cook, nor was such a screen or wall erected on that date after the hearing when MC attorneys Curtner and Fayz, and possibly Basile, learned of Cohen's having joined the firm, and Curtner told Fayz and Basile not to speak with Cohen.

(9) Plaintiff's Motion to Disqualify Defendants' Counsel was filed on August 22, 1994. At this point in time, MC had neither erected a screen or wall or provided notice to the Court pursuant to MRPC 1.10(b).

(10) MC erected and noticed a firm-wide screen or wall to its staff on August 26, 1994.

(11) MC provided notice of its hiring of Cohen to Chief Judge Cook on August 31, 1994.

IV. *Discussion of Relevant MC's Filings/Pleadings in Response to Plaintiff's Motion for Disqualification*

A. *MC's Letter To Chief Judge Cook, August 31, 1994, "RE: Compliance with MRPC 1.10"*

The letter to Chief Judge Cook, from MC hiring principal Thomas Parachini, titled "Compliance with MRPC 1.10," to which was appended the MC August 26, 1994 "Notice: Chinese Wall", is misleading in certain significant respects. In stating that "Mr. Cohen has become an Associate with MC", and omitting the date of his employ, the letter implies that his employment had just begun, or that it began on August 26, 1994, the date of the Notice. The August 26, 1994 "Notice: Chinese Wall", attached to the letter, also omits the beginning date of Cohen's employment.

The August 31st letter states that the August 26, 1994, "Notice confirmed oral instructions given immediately upon learning of Mr. Cohen's employment." This statement is not correct. MC hired Cohen on August 8, 1994, and no oral instructions were given to MC personnel "immediately." The only oral instructions provided to any personnel prior to August 26, were those given by Curtner to two MC attorneys on August 16, 1994. MC's Supplemental Pleading of October 4, 1994,

discussed *infra*, confirms that this statement in the letter to Chief Judge Cook was not correct.

B. *MC's Initial Response in Opposition to Plaintiff's Motion, September 6, 1994*

This MC pleading acknowledged that the motion was controlled by MRPC 1.10(b), and then asserted that MC had fully and faithfully complied with that provision by "erecting a proper and effective Chinese Wall and by promptly notifying the appropriate tribunals," attaching a copy of its August 26, 1994 "Notice: Chinese Wall" memo. (Section IV A, *supra.*) As previously discussed in Section IV A, that belated August 26th Notice did not comply with MRPC 1.10(b).

The September 6th MC pleading contained an "Affidavit of Attorney Gregory Curtner Regarding Compliance with MRPC 1.10," which stated:

6. Instructions and a *formal notice* for compliance with MRPC 1.10 were issued concerning Mr. Cohen's affiliation with the Firm *promptly* upon my learning of his employment. (P. 2 of Curtner's Affidavit dated Sept. 6, 1994, attached to MC Response filed September 6, 1994) (emphasis added).

This statement is not consistent with Curtner's assertion at the instant hearing that he learned about Cohen's employment with MC on August 16, 1994; a formal notice for compliance with MRPC was not issued until 10 days later, August 26, 1994 (Curtner, Hearing, TR. 19). Thus, the Court finds that Curtner's statement in his sworn affidavit that a formal notice was issued promptly upon his learning of Cohen's employment is not correct.

C. *MC's Supplemental Statement in Support of its Response in Opposition, October 4, 1994*

This MC pleading contains a paragraph on Page 4 that directly contradicts the following statement in its August 31, 1994, letter to Chief Judge Cook: "This Notice [August 26, 1994] confirmed oral instructions given immediately upon learning of Mr. Cohen's em-

ployment." Page 4 of this MC Supplemental Response of October 4, 1994, states:

> On August 15, 1994, Mr. Cohen began work as an associate in the Public Finance Group. No general announcement was issued to members of the Firm that Mr. Cohen had joined the Public Finance Group.

Thus, this MC pleading acknowledges, contrary to the August 31, 1994, letter to Judge Cook assuring him that MC had erected a timely comprehensive oral screen, that MC never *"immediately"* issued any general announcement of Steven Cohen's hiring to its staff when he began work there.

This October 4th MC Response also confirms that a MC *Cobb v. Hearst* pleading, filed in this Court, was "served" on Cohen at BK, at a time when he had already commenced employment at MC:

> That a proof of service was addressed to Mr. Cohen [at BK] after August 15, 1994, was sheer force of habit. On August 18, 1994, Mr. Fayz filed Defendants' Identification and Brief Summary of Testimony of Defendants' Witnesses as requested by the Court at the hearing of August 16, 1994. For the accompanying proof of service, Mr. Fayz's secretary inadvertently relied on the form proof that had been used in connection with numerous other filings at Brooks and Kushman. (P.6).

This incident confirms two significant facts. (1) That a comprehensive screen had not been established at MC on August 18, 1994, three days after Cohen began work there, and (2) that MC was aware that Mr. Cohen, who had been served in numerous other filings, had significant involvement in this case while at BK. Had a timely, comprehensive screen been effectuated by MC when Cohen accepted employment (August 8th), or when he commenced employment (August 15th), the secretary, upon whom the blame is placed, would have been aware that Cohen had joined the firm, and accordingly would not have listed him on the proof of service to BK.

Attached to this October 4th MC Supplemental pleading was an affidavit of Keitha Vanderkloot, MC's Director of Legal Recruiting, which states on Page 3:

> 6. At no time during the process of his applying interviewing, or initiating employment with Miller, Canfield did he disclose to me, nor was I or, to my knowledge, anyone else at Miller, Canfield aware that he was involved in litigation in his capacity as an associate at Brooks and Kushman which was adverse to clients of Miller Canfield.

This affidavit conflicts directly with Cohen's testimony at the instant hearing. The Court having had the opportunity to adjudge Cohen's credibility, finds that his testimony was credible (Cohen, Hearing, TR.46). Further, Cohen's testimony was corroborated by Cantor's statement to the Court at the hearing that Cohen had informed him in August, 1994, that he had advised MC, at the outset, of the *Cobb v. Hearst* conflict (Cantor, Hearing, TR.6). The Court finds that Cohen informed Vanderkloot of this conflict during their initial July, 1994, telephone conversation.

**D. *MC's Post–Hearing Supplemental Response in Opposition to Plaintiff's Motion, November 9, 1994***

Attached to MC's November 9, 1994 Post–Hearing Response as Exhibit B, was an affidavit from Robert Harris, Adjunct Professor of Law, University of Michigan Law School. Accepting, for purposes of his opinion, without conceding the veracity of these facts, that MC had been alerted to the conflict problem in the initial Cohen/Vanderkloot phone conversation, and that no formal screen notice was circulated until August 26, 1994, the Harris affidavit states in paragraph 40 on page 6:

> 40. There is no reason to believe that any scrutiny of screening arrangements that the Court might wish to do was prejudiced in any way by the Court receiving notice of screening on August 31, rather than on August 10—even if we assume an August 31 notice to Court was not "prompt", a matter not obvious to me.

The Court rejects this conclusion because it ignores the fact that a prompt, timely notice to the Court, per MRPC 1.10(b)(2), on August 15, the day Cohen began to practice at MC, would have permitted Judge Cook to

both be aware of Cohen's move, and more important, to have been able "to ascertain compliance with the provisions of" Rule 1.10(b), at the *Cobb v. Hearst* hearing on August 16, 1994.

Page 6 of the Harris affidavit sets forth this assumption for purposes of discussion:

42. MC's Personnel/Recruiting Department people failed to operate successfully in this case any formal procedure to ascertain what possible conflicts this incoming lateral transfer might create and they also failed to post any formal screen in this case, *until notified by Curtner of the lateral transfer of Cohen* (emphasis added).

The Court finds that the highlighted portion of the Harris paragraph is erroneous. Curtner notified the Personnel/Recruiting Department on August 16, 1994, but that Department did not post a formal screen until August 26th.

The Harris affidavit notes in paragraph 59 on page 9:

(This case is unusual in having the motion brought by a plaintiff; usually such motions come from defendants, who enjoy the delay that is byproduct of motions to disqualify).

The Court accepts the logic of this observation, and notes that there is no evidence that Plaintiff Cobb brought this Motion for Disqualification for any tactical reason.

The Harris affidavit assumes, in paragraph 61 at page 9, in paragraph 67 on page 10, in paragraph 68 on page 11, and in paragraph 72 on page 12, that there was an oral screen in place at MC on August 16, 1994, when Curtner told Basile and Fayz not to speak to Cohen. The Court rejects this characterization of Curtner's statement to two attorneys as amounting to a comprehensive oral screen at the entire MC firm.

At Paragraph 65 on page 10, the Harris affidavit asserts that whenever a screening solution is adopted, as it has been in Michigan, the Court is required to decide the case "on the credibility of the migrating lawyer." The Court rejects this assertion. That "credibility" situation is only the case where, as in the instant case, MRPC 1.10(b) has not been honored, and there has been no screen

or notice to the Court. In a case where MRPC 1.10(b)(1) & (2) have been honored, the Court is able to ascertain, promptly and objectively, that those provisions of the Rule have been complied with, and further, that the parties to the case have been made aware of the "infected" lawyer's migration to the new firm. Had these facts been on the record before Chief Judge Cook on August 16, 1994, Plaintiff Cobb, the Judge, and Attorneys Curtner, Fayz, and possibly Basile, would have been aware of Cohen's transfer, and this Court and Plaintiff Cobb would not now be requested by MC to rely solely upon its testimony that MC and Cohen did the right thing prior to August 26, 1994.

The Harris affidavit states in paragraph 72 on page 12:

[T]here is no difference in public appearances if the formal notice in this case goes up on August 10, August 14, or August 26. The key facts for appearance purposes are what Curtner did on August 16 and that Cohen knew he couldn't share his information and didn't share it in any way.

The Court rejects Harris' assertion that there is no difference in public appearance whether the formal notice went up on August 10 or August 26. Had the formal Notice been effectuated on or before August 15th, Plaintiff Cobb, Chief Judge Cook and all other relevant parties would have been aware of the conflict, and the fact that a comprehensive screen or wall had been erected to protect Cobb's confidences and to maintain the integrity of the proceedings before the U.S. District Court. There is a significant difference in public appearance, where as here, the formal notice goes up *after* the migrating "infected" attorney has been practicing at the new firm for a period of time. In addition, "what Curtner did on August 16" did not create an oral screen at MC, since it was not communicated to the entire MC firm.

The Court further rejects the Harris affidavit's proffered excuse for MC's failure to honor MRPC 1.10(b), that the Rule is "too burdensome to administer" for a "firm as large as MC to respond faster than it did or be disqualified." (Paragraph 73, page 12). The Court finds that the Rule is clear and uncomplicated, and could have been easily

implemented by a timely comprehensive screen and a prompt notice to the Court.

## V. *Legal Discussion*

The relevant precedential Sixth Circuit decision is *Manning v. Waring, et al.,* 849 F.2d 222 (6th Cir.1988), where the attorney, like Cohen, had been directly involved in the litigation, and then switched firms and practiced in a division of the new firm that was not involved in the case at issue. The Sixth Circuit held "that the district court erred in holding that screening devices can never be effective to protect confidences under the circumstances presented above." *Id.* at 224. Instead, the Sixth Circuit concluded that the presumption of shared confidences is rebuttable upon sufficient proof, *Id.* at 226, and stated that the "district court must determine whether the presumption of shared confidences has been rebutted." *Id.* at 225.

The Sixth Circuit then proceeded to explain how the presumption could be rebutted:

> One method of rebutting the presumption is by demonstrating that specific institutional screening mechanisms have been implemented to effectively insulate against any flow of confidential information from the quarantined attorney to other members of his present firm. *Id.*

The Sixth Circuit noted, with approval, the "efficacy of screening devices" in the case of private attorneys who change their association. *Id.* at 226.

Thus, in the instant case, the district court must determine whether MC can rebut the presumption of shared confidences. The Sixth Circuit set forth two independent issues for determination. First, it must be demonstrated by the firm to which the "infected" attorney transfers, that the transferee has not shared his prior firm's confidences with members of his new firm. *Id.* at 227. In the instant case this Court finds that MC has demonstrated through Cohen's testimony and the affidavits of Curtner, Fayz, Basile, that Cohen did not share Cobb's confidences with others at MC.

Second, the transferee firm, MC must demonstrate that it, "in a timely fashion, implemented screening procedures which will be effective in preventing any disclosures of these confidences." *Id.* at 227. The Court finds that MC did not timely implement comprehensive, effective screening procedures.

The Sixth Circuit noted in *Manning v. Waring, et al.* 849 F.2d 222 (6th Cir.1988), that to rebut the presumption of per se disqualification, the firm would be required to demonstrate that specific screening mechanisms were implemented. The Sixth Circuit opinion relied upon two Seventh Circuit decisions, *LaSalle Nat'l Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983), and *Schiessle v. Stephens,* 717 F.2d 417 (7th Cir.1983). The Sixth Circuit opinion led into an extensive quote from *Schiessle,* with the following statement citing *LaSalle:*

> One method of rebutting the presumption is by demonstrating that specific institutional screening mechanisms have been implemented to effectively insulate against any flow of confidential information from the quarantined attorney to other members of his present firm. *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983).

*Manning, supra* at 225.

In elaborating on whether effective screening mechanisms were in place, the Sixth Circuit quoted the following language from *Schiessle, supra:*

> Such a determination can be based on objective and verifiable evidence presented to the trial court and must be made on a case-by-case basis. Factors appropriate for consideration by the trial court might include, but are not limited to, the size and structural divisions of the law firm involved, the likelihood of contact between the "infected" attorney and the specific attorneys responsible for the present representation, the existence of rules which prevent the "infected" attorney from access to relevant files or other information pertaining to the present litigation, or which prevent him from sharing in the fees derived from such litigation. 717 F.2d at 421 (citation omitted).

*Manning, supra* at 225–26.

In the instant case, the size and structural divisions of MC lessens the likelihood of Co-

hen, employed in a different division, having direct contact with attorneys, paralegals, secretaries, or other staff involved in representing Hearst and Dow Jones. However, while a large law firm may have divisions or sections located on different floors, in the age of electronic technology, where information is stored on computers which can be accessed by persons throughout a firm, client information can no longer be guaranteed to be kept confidential within a section.[4]

As to the issue of rules preventing Cohen from having access to the relevant files or other case-related information, the Court finds there were none in place prior to August 26, 1994, except for Curtner's August 16th oral statement to Basile and Fayz not to speak with Cohen.[5]

As to the requirement of rule mandating that Cohen not share in the fees derived from the instant case, the Court finds that this was satisfied by MC because Cohen would not directly benefit from the fees derived from Hearst and Dow Jones.

The Sixth Circuit Opinion preceded the aforequoted language from *Schiessle* with a discussion of institutional screening mechanisms, and then noted:

"The efficiency of screening devices under appropriate circumstances, has been recognized by the American Bar Association...." In the instance of lawyers who leave government service to enter private practice. In view of the changing nature of the availability of legal services ... we see no reason why the considerations which led the ABA to approve appropriate screening for former government attorneys, should not apply in the case of private attorneys who change their association.

*Manning, supra,* at 226.

Thus, this Court is directed to examine the efficiency and the effectiveness of the specific institutional screening mechanisms implemented, under the parameters of both Sixth Circuit precedent, and MRPC 1.10(b). (discussed at Part VI, *infra.*)

A brief examination of the Seventh Circuit decisions cited in the Sixth Circuit *Manning* opinion, *supra,* confirms this Court's conclusion that a timely, comprehensive effective institutional screening mechanism was not in place in the instant case on August 15, 1994, when Cohen began to practice at MC.

In *Schiessle,* after holding that the district court erred in relying on an irrebuttable presumption of shared confidences, the Seventh Circuit nevertheless affirmed the district court's disqualification of the law firm:

We hold that *at the time* Attorney King changed firms he had knowledge of the Swansons' case and that there were no "institutional mechanisms" in existence at the Ross firm to protect the sacrosanct privacy of the defendants' attorney-client relationship. The *LaSalle* decision requires that when an attorney with knowledge of a prior client's confidences and secrets changes employment and *joins a firm* representing an adverse party, specific institutional mechanisms must be in place to ensure that information is not shared with members of the new firm, even if advertently. *LaSalle,* 703 F.2d at 259. The record in this case shows that the Ross firm at the time of Attorney King's transfer did not have specific institutional mechanisms under *LaSalle* to insure that King would have no contact with the Schiessle case. We hold that the Ross firm must be disqualified from the continued representation of Schiessle.

*Id.* at 421 (emphasis added).

In *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983), the Sev-

---

4. At the instant hearing, in answering the Court's question as to whether someone from another section could access information on the commercial litigation group's computers re *Cobb v. Hearst,* Mr. Curtner answered: "If one wanted to, they could." (Curtner, Hearing, PP. 36–37). This is a compelling reason for requiring a comprehensive firm-wide screen in place when an "infected" attorney joins the firm.

5. The MC confidentiality agreement signed by Mr. Cohen on August 16, 1994, dealt solely with Cohen's not disclosing "any information which I learn about the Firm's clients or others except as authorized and as necessary in connection with the Firm's business." This MC agreement does not provide any protection to Plaintiff Cobb, since it does not deal with Cohen's work at BK.

enth Circuit upheld the District Court's disqualification of the plaintiff's law firm because of the County's former relationship with one of the firms' associates. The Seventh Circuit noted that for a screening arrangement to be effective, it must be "set up at the time when the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem," *Id.* at 259. In the instant case, the screening arrangement was not in effect either when Mr. Cohen joined the firm on August 8, 1994, or when he began to practice at the firm on August 15, 1994.

Although in *LaSalle*, there was a six month delay before the law firm established a screening mechanism, in contrast to the 18 day or 11 day delay in the instant case,[6] the Seventh Circuit's concluding language in *LaSalle* applies with the same force in this case, where MC attempts to excuse its failure to establish a timely, effective screening mechanism, by submitting attorney affidavits asserting that nothing improper occurred:

> Although Mr. Seidler states in his affidavit that he did not disclose to any person associated with the firm any information about the validity of the Agreement or the County's strategy on any matter relevant to this litigation, no specific institutional mechanisms were in place to insure that that information was not shared, even if inadvertently, between the months of February and August.[3] Recognizing that this is an area in which the relevant information is singularly within the ken of the party defending against the motion to disqualify and in which the reputation of the bar as a whole is implicated, we hold that the district court did not abuse the discretion in extending the disqualification of Marc Seidler to the entire firm of Rudnick and Wolfe.

6. MC's delay in notifying the Court pursuant to MRPC 1.10(b)(2) impacted ongoing proceedings in the case, e.g. the hearing on August 16, 1994. This was not a situation where the lawsuit had been stayed or was otherwise in remission during the period of delay in violation of (b)(2).

7. Although Formal Ethics Opinion R–4 involved the migration of an attorney who was a principal in both his original firm and the new firm, and Cohen practiced as an associate at BK and is

3. We, of course, recognize that our analysis frequently requires identification of problems at the time attorneys are hired. In some cases, this may be difficult or even impossible. Nevertheless, we believe that *timely* screening arrangements are essential to the avoidance of firm disqualification.

*LaSalle, supra* at 259 (emphasis in original).

In the instant case, the problem had been clearly noticed to MC when Cohen was first contacted by Vanderkloot, MC's hiring coordinator. Yet, there was no timely institutional screening mechanism in place when Cohen joined MC. Nor did MC promptly notice Chief Judge Cook of the event as required by MRPC 1.10. The Court finds violations of MRPC 1.10(b)(1) and (2) under the reasoning of *Manning, supra,* and the two Seventh Circuit decisions cited by the Sixth Circuit, *LaSalle, supra* and *Schiessle, supra.*

## VI. Rule Violation: Local Court Rule 111.1(d)/MRPC 1.10(b)

Local Court Rule 111.1(d) of the Federal District Court for the Eastern District of Michigan has adopted for application the Rules of Professional Conduct adopted by the Michigan Supreme Court. The provisions relevant to the instant case are MRPC 1.10(b), (1) and (2) (set forth on pages 2–3, *supra* ).

The State Bar of Michigan Standing Committee on Professional and Judicial Ethics issues Formal Opinions on Lawyer Ethics relating to the MRPC. That Committee's Formal Opinion Number R–4 (September 22, 1989) (hereinafter Opinion R–4) (ATTACHMENT III) sets forth what is required when a lawyer who has acquired confidential protected information as to clients of the former firm, transfers to a new firm which is involved in actions materially adverse to the client of the former firm.[7]

employed as an associate at MC, the distinction is not significant. The critical issues are whether Cohen, the migrating attorney, represented Plaintiff Cobb in this matter MRPC 1.9, and was thereby in a position to receive Cobb's confidences and secrets, MRPC 1.6. Formal Opinion R–4 notes, on Page 4, that MRPC 1.10 "must be understood in terms of MRPC 1.6 and 1.9(b)." In the instant case, Cohen provided personal representation to Plaintiff Cobb. He was not "a

Opinion R–4 noted that the previous rule had been that disqualification of the new migrating member of a law firm, also required disqualification of the entire firm. The Opinion pointed out that MRPC 1.10(b) establishes an exception to that general rule, if certain conditions are carried out. To avoid disqualification of the firm to which the "infected" attorney transfers, Opinion R–4 stated that the transferring lawyer must be screened from any participation. The Syllabus of R–4 stated:

4. Any screening procedure must be installed *immediately* when the disqualified lawyer joins the new firm, or the firm will be disqualified from continuing to participate in all such actions and proceedings.

5. In addition to establishing screening procedures, the disqualified lawyer must *immediately* notify all affected tribunals concerning the change of employment, informing them of the screening and fee segregation procedures to be utilized. Copies of the notice must be provided to all other parties in the actions and proceedings. (emphasis added)

The text of Opinion R–4 set forth the necessity of establishing a timely and truly impenetrable comprehensive Chinese Wall:

Given the omnipresent possibility that the former firm will file a motion to disqualify the acquiring firm, and the concomitant need to persuasively demonstrate to a judicial arbiter that a truly inpenatrable Chinese Wall has been erected, a particularly noteworthy example of a litigation-proof strategy displays itself in *American Sigma, Inc. v. QED Environmental Systems*, ── USPQ (BNA) (No. 88–1, Comm'r Pat, July 31, 1989). [E.D. MI, Duggan, J. # 87–CIV–70070–DT, Nov. 7, 1989]. There the acquiring firm had a Standing Conflicts Committee, which conducted an ongoing review of its connection with matters to which members, in any former employments, may have had any professional contact. When it prepared to add a new member, it identified files to which a Chi-

nese Wall was needed in a written communication addressed to all firm members, including non-lawyer confidential employees, and circulating the resulting memorandum, requiring each lawyer and confidential employee to sign or initial it prior to the date on which the new employee joined the firm. Note that this attention to detail, such as the inclusion of confidential nonlawyer employees, i.e. employees with access to files or other material protected by lawyer-client privileges, is required by MRPC 5.3. . . .

*R–4*, PP. 6–7.

The Opinion noted the Sixth Circuit's position on this issue—that while some Courts have adhered to a strict, disqualification philosophy, "other Courts recognized the theoretical facility of screening procedures, but ordered disqualification when such procedures were not in place at the outset of the employment transfer" (P.7). The Opinion cited to *LaSalle National Bank v. County of Lake*, 703 F.2d 252 (7th Cir.1983), the Seventh Circuit decision relied upon by the Sixth Circuit in *Manning, supra*.

Opinion R–4 notes that under MRPC 1.10(b), the concepts of (1) screening and fee apportionment, and (2) prompt written notice to the court, are separate and distinct—and both requirements must be fulfilled to avoid disqualification. As to the second requirement, the Ethics Opinion emphasized that the notice must "be provided to all affected tribunals immediately upon the lawyers association with the" firm (P.8). Requiring prompt written notice to the court to permit it to ascertain compliance with the provisions of this rule means that the screening must have been in place immediately upon an infected lawyer's joining the firm; otherwise there would be no screen for the Court to validate.

A 1990 article titled "Lawyers Changing Firms," authored by Marcia Proctor, then Regulation Counsel, now General Counsel of

---

mere associate who disclaimed access to confidential information" (R–4, P.8). Indeed, Formal Opinion R–4 states: "If the lawyer has physically accessed a file, he must be charged with knowledge of its contents." (P.8). Finally, it is be-

cause Cohen would be disqualified from representing Defendants under MRPC 1.9, that his case, which involves his new employer, is governed by MRPC 1.10(b).

the State Bar of Michigan, discussed Opinion R–4:

> Thus, [s]creening is all important, and R–4 describes certain minimum protections which must be established.

> First, any screening procedure must be installed immediately when the interviewed lawyer joins the new firm or the new firm will be disqualified from continuing to participate in actions and proceedings in which the interviewed lawyer is disqualified.

*Michigan Bar Journal,* February 1990, PP. 154, 156.

The Court finds that MC violated both provisions of MRPC 1.10(b) in the instant case. As to subsection (1), MC failed to promptly and effectively screen Cohen, when he was hired (August 8), or when he began to work there (August 15). As to subsection (2), the Court finds that a written notice sent to the Court August 31, 1994, 23 days after the "infected" attorney joined the firm, 16 days after he began work there and 15 days after MC had appeared before that Court on a matter involving that very same case (August 16, 1994), does not amount to prompt written notice to the appropriate tribunal.

## VII. Conclusion

Having had advance knowledge in July, prior to Steven Cohen's beginning work at MC on August 15, 1994, that his hiring created a conflict situation, MC did not implement a comprehensive screening procedure until August 26, 1994. This was a violation of MRPC 1.10(b). Further MC did not provide prompt notice to Chief Judge Cook to enable him to ascertain compliance with this Rule, in violation of MRPC 1.10(b)(2).

MC's lead attorney in the instant case, Gregory Curtner stated at the October 27, 1994 hearing, that when he learned about Cohen's joining MC on August 16th, Cohen "was screened because the people involved [Basile and Fayz] were instructed not to talk to him, and as soon as we could determine

the balance of the facts and determine what was supposed to be done we issued a formal rule." (Curtner, Hearing, P.79). The Court rejects Curtner's interpretation of MRPC 1.10(b)(1) to require that MC only screen the lawyers working on the case. MRPC 1.10(b)(1) requires a screen of all firm personnel, including all attorneys, paralegals and secretaries, and no such screen was erected until August 26, 1994. Opinion R–4 noted that "[a]ll that has been said about Chinese Walls thus applies with nearly equal force to . . . nonlawyer employees of the acquiring law firm." (Page 7)

Had MRPC 1.10(b) been properly honored by MC's providing prompt notice to the Court, Chief Judge Cook, would have been aware of Cohen's switch to MC at the August 16th *Cobb v. Hearst* hearing, and would have been able to carry out the prophylactic procedures that the Rule places upon the Court:

(1) To ascertain whether or not MC had timely and effectively carried out the screening requirement of MRPC 1.10(b)(1);

(2) To explain to Mr. Cobb, who was also unaware at that time of Cohen's switch to MC, the procedures established by the legal profession to protect his confidences and his interests, and to state on the record, that they had been timely set in place when Cohen was hired by MC. Failure to implement the objective procedures of MRPC 1.10(b), would require the client, in order to advance his claim where he felt aggrieved, to reveal to the Court the confidences and secrets provided to his former attorney [8]—the very disclosures the Rule is intended to protect.

The Sixth Circuit and the Michigan Supreme Court have recognized that per se disqualification unfairly penalizes attorney mobility. This view permits the presumption of per se disqualification to be set aside, under a provision like MRPC 1.10(b), provided that the protective mechanisms, contained in (1) and (2) are honored: a timely, compre-

---

8. Michigan Formal Ethics Opinion R–4, provided this definition of confidences and secrets:
   (a) 'Confidence' refers to information protected by the client-lawyer privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

hensive screen throughout the firm,[9] and prompt notice to the Court. Neither was honored here.

The legal profession and the Courts require a timely screen [10] and prompt notification of the Court, because it is not sufficient to merely allow the infected attorney and his new colleagues to testify, belatedly, "Don't worry, everything was proper".[11] In essence, that is what occurred at the October 27th hearing in the instant case—where MC testimony and affidavits sought to backdate the propriety of Cohen's and MC's conduct from the date of the screen, August 26, 1994, to the date of Cohen's hiring, August 8th, or the date he began work at MC, August 15, 1994. If this Court were to hold that a migrating lawyer's affidavit or testimony, or that of his new colleagues was sufficient, than there would be no reason to have MRPC 1.10(b), or any other rules or screens or notices required, when the Plaintiff's "infected" attorney transfers to the adversary firm.[12]

The Michigan Rules of Professional Responsibility contain procedures to be implemented to protect the parties and the Courts where an "infected" attorney migrates to an adversary firm, and further to provide the public with a basis for discerning that the legal profession has established protective procedures. These Rules must be honored by the legal profession and enforced by the Courts. They were not honored by MC, and accordingly, this Court will grant Plaintiff's Motion, and Order that the firm of Miller, Canfield, Paddock & Stone be disqualified from representing Defendant's Hearst and Dow Jones in this case.

**SO ORDERED.**

Attachment I

Law offices of

Miller, Canfield, Paddock and Stone, P.L.C.

a Professional Limited Liability Company

150 West Jefferson, Suite 2500

Detroit, Michigan 48226

TELEPHONE (313) 963–6420

TWX 810–221–5007 MILLCNFLD DET

August 31, 1994

Honorable Julian A. Cook
United States District Court
Eastern District of Michigan
U.S. Courthouse
231 Lafayette Boulevard
Detroit, Michigan 48226

---

9. An additional reason for requiring immediate implementation of a comprehensive screen was Cohen's testimony, that when he left BK, he took home with him a copy of his BK memo on the *Cobb* case, and that he had brought it with him to MC on the morning of the instant hearing to refresh his recollection prior to testifying. (Cohen, Hearing, PP 49–53). While there was no claim that any of that information was passed on to any MC personnel, the fact that confidential BK *Cobb* information was "out and about," combined with the fact that MC personnel were not timely advised of Cohen's joining the firm on August 8th and his beginning employment of August 15th, left open the possibility of an "infecting," that the provisions of M.R.P.C. 1.10(b) were intended to eliminate.

10. "[T]he screening devices must be employed as soon as the disqualifying event occurred." *Goot*, 894 F.2d 235 (quoting *LaSalle Nat'l Bank*, 703 F.2d at 259) *Cromley v. Bd. of Education of Lockport*, 17 F.3d 1059, 1065 (7th Cir.1994).

11. [W]hen one attorney is infected with privileged information, the other attorneys at the firm are presumed to become contaminated and must also become disqualified. This presumption of shared knowledge among attorneys in a firm is rebuttable. However, Courts have held that the sworn word of an infected attorney or his or her uninfected colleague that there was no cross-pollination between them is not a satisfactory rebuttal ...
*Papanicolaou v. Chase Manhattan Bank*, 720 F.Supp. 1080, 1087 (S.D.N.Y., 1989) (citations omitted).

12. The U.S. Court of Appeals for the Seventh Circuit noted, in *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 259 (7th Cir.1983), "the relevant information is singularly within the ken of the party defending against the motion to disqualify and in which the regulation of the bar as a whole is implicated." The legal profession owes the party adversely affected by the "infected" lawyer's transfer, more than that lawyer's "trust me" affidavit or testimony, or that of the hiring firm's lawyers, asserting that nothing improper occurred.

**RE: Compliance with MRPC 1.10:**
*Cobb Publishing Inc. et al. v. Hearst, et al.,*
**Case No. 93–CV–71771–DT**

Dear Judge Cook:

Miller, Canfield, Paddock and Stone has represented the defendants in the above captioned litigation since its inception. Plaintiffs have been represented by the firm of Brooks & Kushman. Attorney Steven G. Cohen, who, until recently, was an Associate at Brooks & Kushman, had some involvement in that firm's representation of the plaintiffs. I am writing to you as Miller, Canfield's Hiring Principle to inform the Court, pursuant to Michigan Rules of Professional Conduct 1.10 (MRPC 1.10), that Mr. Cohen has become an Associate with Miller, Canfield, Paddock and Stone. Mr. Cohen is employed in our Public Finance Group and does not work for or with the Commercial Litigation Group.

Because of Mr. Cohen's previous involvement in the litigation, and pursuant to MRPC 1.10, adopted by the United States District Court for the Eastern District of Michigan, the accompanying formal Notice has been issued and published to erect an appropriate "Chinese Wall" to screen Mr. Cohen from Miller, Canfield's continuing representation of these defendants. This Notice confirmed oral instructions given immediately upon learning of Mr. Cohen's employment.

The attorneys and other personnel at Miller, Canfield, including Mr. Cohen, are fully cognizant of the ethical obligations attending Mr. Cohen's association with Miller, Canfield. The requirements and limitations of MRPC 1.10 reiterated in the accompanying Notice are and have been observed both before and after the date of Mr. Cohen's affiliation with the Firm.

Sincerely,

MILLER, CANFIELD, PADDOCK AND STONE

By /s/ Thomas G. Parachini
Thomas G. Parachini

---

MILLER, CANFIELD, PADDOCK AND STONE

OFFICE MEMORANDUM

TO: All Attorneys, Paralegals, Secretary and Staff
FROM: Thomas G. Parachini
RE: Steven G. Cohen
DATE: August 26, 1994

**NOTICE: CHINESE WALL**

Recently, attorney Steven G. Cohen joined the firm in the Public Law Section. Steve is officed on the 20th Floor.

Steve was previously employed at Brooks & Kushman. During his tenure at Brooks & Kushman, Steve had some involvement with two lawsuits wherein Brooks & Kushman represented parties adverse to current clients of the firm:

(1) *Joseph T. Cobb and Cobb Publishing, Inc. v. The Hearst Corporation and Dow Jones & Company,* in the United States District Court for the Eastern District of Michigan.

(2) *Advance Watch Co., Plaintiff v. American Licensing Group, L.P., Defendant and American Licensing Group, L.P., Counter–Plaintiff and Third–Party Plaintiff v. Advance Watch Co., Counter–Defendant and Pacific Standard Time, Inc., Defendant,* in the United States District Court for the Eastern District of Michigan.

Miller Canfield represents The Hearst Corporation and Dow Jones & Company in case number one and Defendant American Licensing Group, L.P. in case number two.

This Notice will confirm the prior instructions given regarding these matters and constitutes notice to all regarding the appropriate steps to be taken with respect to these files.

Pursuant to Michigan Rules of Professional Conduct 1.10, Steve is prohibited from any participation in those matters during his tenure at Miller, Canfield. The following screening conditions also apply and must be

scrupulously observed by all attorneys, including Steve, as well as all paralegals, secretaries and staff:

A. The above referenced cases are not be discussed with Steve;

B. The above referenced cases are not to be discussed by others in Steve's presence;

C. No attorney, paralegal, secretary of staff member will receive any information from Steve concerning these cases;

D. Steve shall not view any documents or other material related to these cases;

E. Any files, documents or other material relating to these cases which may be present on the 20th Floor shall be removed by the client-responsible attorney;

F. All files, documents or other materials relating to these cases shall be secured by the client-responsible attorney; and

G. Steve shall not participate in any fees derived by Miller, Canfield from its representation of the above referenced clients.

All attorneys, paralegals, secretaries and staff members are required to observe these restrictions.

### Attachment III

### R–4

### September 22, 1989

### SYLLABUS

1. A lawyer who transfers from one law firm in which the lawyer is a principal—and is thus rebuttably presumed to have acquired information protected by MRPC 1.6 and 1.9(b) as to clients of the former firm—to another, where the new firm is involved in actions or proceedings materially adverse to clients of the former firm, is disqualified from all matters involving clients of the former firm which are "the same or substantially related" to matters with which the transferring lawyer had involvement while associated with the former firm.

2. To avoid similarly disqualifying the firm to which the thus disqualified lawyer transfers, the transferring lawyer must be screened from any participation or fee sharing as to the related actions and proceedings, or the new firm will be disqualified from continuing representation of existing, or undertaking representation of potential future clients in the related actions and proceedings.

3. At a minimum, screening and fee segregation must include: (a) exclusion of the disqualified lawyer from any participation in the action; (b) instruction to all other lawyers in the firm (1) not to discuss the matter in the disqualified lawyer's presence, (2) not to allow the disqualified lawyer to view any documents or other material relating to the action or proceeding, and (3) not to receive any information from the disqualified lawyer concerning the matter; (c) moving files pertaining to the matter to a physically segregated area or marking them with special coding; and (d) segregation of fees derived from such professional representation, so that the disqualified lawyer does not, directly or indirectly, receive any portion of the fees.

4. Any screening procedure must be installed immediately when the disqualified lawyer joins the new firm, or the new firm will be disqualified from continuing to participate in all such actions and proceedings.

5. In addition to establishing screening procedures, the disqualified lawyer must immediately notify all affected tribunals concerning the change of employment, informing them of the screening and fee segregation procedures to be utilized. Copies of the notice must be provided to all other parties in the actions and proceedings.

6. Screening and fee segregation procedures must remain in place until there is no possibility that information which is confidential under MRPC 1.6 or 1.9(b) might be utilized against a former client of the transferring lawyer, or for the benefit of the transferring lawyer or any third person; the transferring lawyer and the new firm must also remain vigilant to the indefinite future to assure that such confidences remain fully protected, and that screening procedures may be immediately invoked whenever new business warrants. Note, however, that in general, if new representation, even though involving litigation against a former client,

does not implicate client confidences or secrets, then conflict considerations would not ordinarily preclude the lawyer from undertaking the new representation.

7. Where the transferring lawyer is a principal in the former firm, rather than a junior associate, the number of situations in which screening procedures are necessary to avoid disqualification may increase by virtue of the presumption arising from MRPC 5.1(c)(2), which obligates principals in a law firm to be cognizant of the handling of all matters by their subordinates. Former principals would have the burden of persuasion as to any claim that they did not possess disqualifying confidential information.

8. A law firm which, by virtue of a new hire, finds it necessary to erect such screening procedures may find it advisable to conduct training seminars for its employees, to heighten awareness of the applicable ethical constraints.

References: MRPC 1.6, 1.7, 1.9(b), 1.10(a), 1.10(b), 1.11, 1.12, 3.5(b), 5.1(c)(2), 5.3; MCR 2.117(B)(3)(b), 8.122(3)(b); MCL 333.21515; *Bernstein, Bernstein, Wile & Gordon v. Ross,* 22 Mich.App. 117, 123 [177 N.W.2d 193] (1970); *Crawford W. Long Mem Hosp v. Yerby,* [258 Ga. 720] 373 S.E.2d 749 (Ga. 1988); *Feaheny v. Caldwell,* 175 Mich.App. 291 [437 N.W.2d 358] (1989); *NFC, Inc v. General Nutrition, Inc,* 562 F.Supp. 332 (D.C.Mass.1983); *Sunkist Growers, Inc v. Benjamin H. Ansel Co,* 221 USPQ (BNA) 1077 (Comm'r Pat 1984); *Taxpayers Ass'n, Inc v. Haber,* 634 F.2d 182 (C.A.5 1981); *United States v. Agurs,* 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

## TEXT

A lawyer is a principal in a law firm, which is primarily engaged in tort defense litigation, including medical malpractice and product liability cases. The lawyer proposes to resign from the firm and associate as a partner or principal in another law firm which specializes in tort litigation, on behalf of plaintiffs. At the time this job transfer would occur, there are several matters pending in which the plaintiff firm represents interests opposite to the interests represented by the defense firm. In some of these cases, the lawyer is personally in charge of the defense, while in others the lawyer has not taken an active personal role.

In medical malpractice cases, the clients of the defense firm being sued by the plaintiff firm are mostly hospitals. The hospital clients of the defense firm have come to view the lawyer as the "partner in charge" of their accounts, even though the lawyer might not necessarily represent the hospital as counsel of record in each case under litigation handled by the defense firm. With respect to the hospital clients, the defense firm is merely one of several defense firms handling their malpractice litigation. Defense firm product liability cases largely involve representation of liability insurers. The lawyer has no personal involvement in any product liability case in which the plaintiff firm represents the opposing interest.

The lawyer is concerned about the ethical difficulties that may arise in the event the lawyer successfully negotiates to transfer to the plaintiff firm as a principal. The lawyer's first concern is existing cases, in which the two firms are on opposite sides. As subcategories the lawyer differentiates those cases in which the lawyer is personally counsel of record or in charge of the defense, and those in which the lawyer had no personal involvement in the defense and had not actually acquired information protected by the client confidentiality rules, MRPC 1.6 and 1.9(b), which are material to the matters in litigation. The lawyer acknowledges that the lawyer may well have initially reviewed file materials upon receipt of the case from the defense client, solely for the purpose of assigning the case, in the lawyer's role as principal, to another attorney within the office.

The second major category is future cases, subdivided into those in which the defendant is a hospital which formerly viewed the lawyer as the partner in charge, and thus as its individual attorney, and those in which the client of the defense firm was not personally represented by the lawyer while the lawyer was associated with the defense firm, and as to whom the lawyer never acquired informa-

tion protected by MRPC 1.6 and 1.9(b) material to the matters in litigation.

The lawyer asks what steps have to be taken by the plaintiff firm to comply with the screening requirements of MRPC 1.10(b)(1); the underlying concern of the question is that the plaintiff firm does not wish to be disqualified from continuing its representation in existing cases or accepting representation in future cases, in which the defense firm or its clients may be an adversary. It is inherent in the questions posed that the lawyer assumes, and properly so, that the lawyer is personally disqualified from further contact with any matters involving former clients of the defense firm which are "the same or substantially related" to a matter with which the lawyer had involvement while associated with the defense firm. The inquiry recognizes that, in general, disqualification of a member of a law firm results in disqualification of the firm.

MRPC 1.10(b) provides:

*"When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter, unless:*

> *"(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and*
>
> *"(2) written notice is promptly given to the appropriate tribunal to enable it to ascertain compliance with the provisions of this rule."*

MRPC 1.11 deals with the special, corollary problem of successive government and private employment. In relevant part, the Rule provides:

*"(a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personal-*

*ly and substantially as a public officer or employee, unless the appropriate government agency consents after consultation. No lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, unless:*

> *"(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and*
>
> *(2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule.*
>
> *"*. . .
>
> *"(d) As used in this rule, the term 'matter' includes:*
>
> *"(1) any judicial or other proceeding, application, request for ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest, or other particular matter involving a specific party or parties; and*
>
> *"(2) any other matter covered by the conflict of interest rules of the appropriate government agency."*

MRPC 1.10 and 1.11 must be understood in terms of MRPC 1.6 and 1.9(b), specifically referenced in MRPC 1.10(b). MRPC 1.6 provides in pertinent part:

*"(a) 'Confidence' refers to information protected by the client-lawyer privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.*

*"(b) Except when permitted under paragraph (c), a lawyer shall not knowingly:*

> *"(1) reveal a confidence or secret of a client;*
>
> *"(2) use a confidence or secret of a client to the disadvantage of the client; or*
>
> *"(3) use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure."*

MRPC 1.9(b) provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter:

" . . .

"(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known."

MRPC 3.3, and the unquoted portions of MRPC 1.6, deal with situations in which the client has in essence committed perjury, and the lawyer is required to take steps to both avert a fraud on the court or other tribunal and to assuage any damage to third persons.

Although MRPC 1.6 and MRPC 1.9(b) are essentially unchanged from the Michigan Code of Professional Responsibility (MCPR), MRPC 1.10 and 1.11 are a substantial modification of MCPR DR 5–105(D) (conflict of interest and disqualification) and MCPR DR 9–101(B) (barring private employment in matters in which government attorneys had "substantial responsibility").

Under the MCPR, the use of screening procedures, which came to be known as the "Chinese wall defense" to law firm disqualification, was sometimes found inadequate to protect client confidentiality and to fulfill the letter and spirit of the Code, including Canon 9: *Westinghouse Electric Corp v. Kerr–McGee Corp*, 580 F.2d 1311 (C.A.7 1978), *cert. den.*, 439 U.S. 955 [99 S.Ct. 353, 58 L.Ed.2d 346] (1978); *Fund of Funds, Ltd v. Arthur Andersen & Co.*, 567 F.2d 225 (C.A.2 1977); *Central Milk Products Coop v. Sentry Food Stores, Inc*, 573 F.2d 988 (C.A.8 1978); *Hull v. Celanese Corp*, 513 F.2d 568 (C.A.2 1975); *W.E. Bassett Co v. H.C. Cook Co*, 201 F.Supp. 821 (D.C.Conn.1961), *aff'd. per curiam*, 302 F.2d 268 (C.A.2 1962).

In consequence of this restrictive attitude, commentators came to recognize that public policy concerns were not well served. For example, government agencies found it difficult to attract talented lawyers at entry level positions, because their opportunities for future employment in the private sector would be curtailed by firms in the field not wishing to be disqualified from continuing representation of existing clients solely for the purpose of accommodating a new hire. Kaufman, *The Former Government Attorney and Canons of Professional Ethics*, 70 Harv L Rev 657 (1957); Lacovara, *Restricting the Private Practice of Former Government Lawyers*, 20 Ariz L Rev 369 (1978); Note, *The Former Government Attorney and the Code of Professional Responsibility: Insulation or Disqualification*, 26 Catholic U L Rev 402 (1977); Note, *Ethical Problems for the Law Firm of a Former Government Attorney: Firm or Individual Disqualification*, 1977 Duke L J 512; Comment, *Conflicts of Interest and the Former Government Attorney*, 65 Georgetown L J 1025 (1977); Note, *Business as Usual: The Former Government Attorney and ABA Disciplinary Rule 5–105(D)*, 20 Hastings L J 1537 (1977).

Similarly, it was noted that mechanical application of firm disqualification rules had undesirable effects beyond the confines of any particular litigation, and effectively made new associates slaves to their original law firm, unable to seek professional opportunity in other firms in the field, because the disqualification principle impeded their access to the marketplace. Note, *Unchanging Rules in Changing Times: The Canons of Ethics and Intra–Firm Conflicts of Interest*, 73 Yale L J 1058 (1964); Tybor, "Conflicts: When Big Isn't Better", National L J, May 7, 1979, at 1, col 4, 17, col 2; Note, *The Chinese Wall Defense to Law Firm Disqualification*, 128 U Penn L Rev 677, 679 (1980).

In other areas of the law, Michigan had already recognized the unfairness, and undesirability from a public policy perspective of limiting the competitive field for junior associates of professional enterprises handling confidential material. See, e.g., *Bernstein, Bernstein, Wile & Gordon v. Ross*, 22 Mich. App. 117, 123 [177 N.W.2d 193] (1970).

As time wore on, the concept of screening the disqualified lawyer from any contact with matters involving former clients or a former law firm, thereby insulating the acquiring law firm from disqualification, gained currency and respectability. Achieving judicial acceptance with the decision in *Kesselhaut v. United States*, 555 F.2d 791 (Ct. of Cl.1977), the movement gained adherents, one court at

a time; *Armstrong v. McAlpin,* 625 F.2d 433 (C.A.2 1980) (*en banc* ), *vacated on other gds,* 449 U.S. 1106, 66 L.Ed.2d 835, 101 S.Ct. 911, and *disagreed with on other gds; Re Continental Investment Corp,* 637 F.2d [1] (C.A.1 1982), *later app,* 637 F.2d 8; *NFC, Inc v. General Nutrition, Inc,* 562 F.Supp. 332 (D.C.Mass.1983); *Kadish v. Commodity Futures Trading Commission,* 553 F.Supp. 660 (D.C.N.D.Ill.1982); *Index Fund, Inc. v. Hagopian,* 107 F.R.D. 95 (D.C.S.D.N.Y.1985); [*Bauunternehmung*] *v. U.S.,* 8 Cl.Ct. 793, 33 CCF P 74028 (1985).

These cases approved screening that precluded the disqualified lawyer from deriving any remuneration from the funds obtained by the firm in the course of representation in the matter, excluded the disqualified lawyer from any form of participation in the action, instructed all other lawyers in the firm not to discuss the matter in the disqualified lawyer's presence or to allow the disqualified lawyer to view any documents or other material related to the litigation, and precluded the other lawyers from receiving any information from the disqualified lawyer. In some of these cases, the firm went an extra step, holding training seminars for lawyers in the firm to apprise them of the disqualification situation and familiarize them with the relevant ethical constraints and need for strict adherence to procedures designed to guarantee confidentiality.

Given the omnipresent possibility that the former firm will file a motion to disqualify the acquiring firm, and the concomitant need to persuasively demonstrate to a judicial arbiter that a truly impenetrable Chinese wall has been erected, a particularly noteworthy example of a litigation-proof strategy displays itself in *American Sigma, Inc v. QED Environmental Systems,* —— USPQ (BNA) —— (No. 88–1, Comm'r Pat, July 31, 1989). There the acquiring firm had a standing Conflicts Committee, which conducted an ongoing review of its connection with matters to which members, in any former employments, may have had any professional contact. When it prepared to add a new member, it identified files to which a Chinese wall was needed in a written communication ad-

dressed to all firm members, including nonlawyer confidential employees, and circulated the resulting memorandum, requiring each lawyer and confidential employee to sign or initial it prior to the date on which the new associate joined the firm.

Note that this attention to detail, such as the inclusion of confidential nonlawyer employees, i.e., employees with access to files or other material protected by lawyer-client privilege, is required by MRPC 5.3, which provides:

> *"With respect to a nonlawyer employed by, retained by, or associated with a lawyer:*
>
> *"(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;*
>
> *"(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and*
>
> *"(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:*
>
>> *"(1) the lawyer orders or, with knowledge of the relevant facts and the specific conduct, ratifies the conduct involved; or*
>>
>> *"(2) the lawyer is a partner in the law firm in which the person is employed or has direct supervisory authority over the person and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."*

See also, *American Sigma, Inc v QED Environmental Systems, Inc,* —— USPQ (BNA) —— (No. 88–1, Comm'r Pat, July 31, 1989); *Sunkist Growers, Inc v Benjamin H Ansehl Co,* 221 USPQ (BNA) 1077 (Comm'r Pat, 1984).

All that has been said about Chinese walls thus applies with nearly equal force to both nonlawyer employees of the acquiring law firm, and nonlawyer associates who contem-

poraneously accompany or subsequently join the transferring lawyer. The same would hold true if a nonlawyer employee transfers from one law firm to another alone, or as part of a group of nonlawyers; appropriate Chinese walls must be erected. *Kapco Mfg. Co, Inc v. C & O Enterprises, Inc,* 637 F.Supp. 1231 (N.D.Ill.1985); *Williams v. Trans World Airlines, Inc.,* 588 F.Supp. 1037 (W.D.Mo.1984); *Glover Bottled Gas Corp v. Circle M. Beverage Barn, Inc.* [129 A.D.2d 678], 514 N.Y.S.2d 440 (1987); ABA Op 88–1526 (1988).

Even so, some courts resisted this movement, and adhered to a strict, firm-wide disqualification philosophy. *Cheng v. GAF Corp,* 631 F.2d 1052 (C.A.2 1980), *vacated on other gds,* 450 U.S. 903 [101 S.Ct. 1338], 67 L.Ed.2d 327, *on remand* 566 F.Supp. 350, *rev'd on other gds,* 713 F.2d 886 (CA 2 1984); *Re Asbestos Cases,* 514 F.Supp. 914 (DC ED Va 1981). Other courts recognized the theoretical facility of screening procedures, but ordered disqualification when such procedures were not in place at the outset of the employment transfer. *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (C.A.7 1983); *Illinois v. Borg, Inc,* 553 F.Supp. 178 (DC ND Ill 1982); *Hallmark Cards, Inc v. Hallmark Dodge, Inc,* 616 F.Supp. 516 (DC WD Mo 1985); *[EZ Paintr ] Corp v. Padco, Inc,* 746 F.2d 1459 (C.A. FC 1984). *Geisler v. Wyeth Laboratories,* 716 F.Supp. 520, (1989) [existence of Chinese wall at outset of transfer key factor in upholding validity of the arrangement].

The Michigan Supreme Court appears to have embraced the more modern view with its adoption of MRPC 1.10(b) and 1.11, but the Rules must be understood in their historical context. It is noteworthy that the court specifically addressed the separate concepts of screening and fee apportionment, in recognition of the developed case law, and added a requirement, MRPC 1.10(b)(2), and 1.11(a)(2) that prompt written notice be given to the appropriate tribunal, to enable the tribunal to ascertain compliance with the provisions of the rule.

This latter requirement provides the answer to one subsidiary question posed by the lawyer, who proposes notifying affected tribunals only in those circumstances where an affected litigant raises a question regarding potential conflict of interest. To the contrary, the notice must, in accordance with the clear requirements of MRPC 1.10(b)(2) and 1.11(a)(2), be provided to all affected tribunals immediately upon the lawyer's association with the plaintiff firm, irrespective of whether any litigant has interposed an objection.

Additionally, by virtue of MRPC 3.5(b), copies of such notices must be provided to all parties in affected litigation; otherwise, the notice would constitute forbidden *ex parte* communication with a tribunal concerning a pending matter. Dissemination of notice is appropriate, because the rule is designed to protect the interests of the lawyer's and defense firm's clients, present and former, as well as to insure institutional integrity. This also enables affected courts to effectuate their summary jurisdiction over lawyer conduct impacting on actions or proceedings pending in those courts. MCR 8.122.

Pertinent also to the analysis of the questions posed is the fact that the lawyer is a principal in the firm, not a junior associate. Generally, the appearance of one lawyer in a firm in litigation constitutes the appearance of all lawyers. MCR 2.117(B)(3)(b). But a principal in a firm is presumed to have supervisory authority over other lawyers in the firm, and, presuming that lawyers conform their conduct to the requirements of the Rules of Professional Conduct, such principals must be presumed to have sufficient involvement in cases being handled by their firms that they can properly exercise their supervisory responsibilities. See MRPC 5.1(c)(2); *Taxpayers Ass'n, Inc v. Haber,* 634 F.2d 182 (C.A.5 1981); *Crawford W. Long Memorial Hosp v. Yerby,* [258 Ga. 720], 373 S.E.2d 749 (1988). If the lawyer has physically accessed a file, the lawyer must be charged with knowledge of its contents. *United States v. Agurs,* 429 [427] U.S. 97 [96 S.Ct. 2392], 49 L.Ed.2d 342 (1976).

A mere associate lawyer who disclaimed access to confidential information protected by MRPC 1.6 or 1.9(b) might well be absolved of the need to erect a Chinese wall

about himself or herself when transferring to another firm, with respect to clients of the former firm as to whom he or she had no personal responsibility or involvement. But the lawyer, as a principal in the defense firm, has at a minimum the burden of persuasion that, as to any client of the defense firm with an active file at the time of the lawyer's departure, or as to whom the defense firm may, in the course of past litigation, have acquired confidential information which could be used to the detriment of the client in future litigation, that the lawyer did not, in fact, acquire such client confidences.

With respect to hospital clients, who by the lawyer's own statement look to him as the partner in charge, and who was thus in a principal supervisory capacity over all such litigation, the presumption would seem to be well nigh irrebuttable. The lawyer, for example, may have acquired unique insights into means of acquiring otherwise privileged information, such as Peer Review Committee data, see MCL 333.21515, which would greatly facilitate the task of the plaintiff firm in prosecuting medical malpractice claims against the lawyer's former hospital clients.

By contrast, a government lawyer moving to the private sector is affected by the less restrictive requirement that the lawyer has "personally and substantially participated in a matter" for screening to be necessary, MRPC 1.11(a). Indeed, some authorities hold that Chinese walls are inherently ineffective when the person to be screened is a firm partner, reasoning that a law firm cannot function "if a partner may be excluded from participating in the business of the firm." *Plus Products v. Con–Stan Industries, Inc,* 221 USPQ (BNA) 1071, 1075 (Comm'r Pat, 1984).

Only strict geographical separation would suffice to alter this disqualifying equation. *NFC, Inc v. General Nutrition, Inc,* 562 F.Supp. 332 (Mass 1983). Given the lack of absolute prohibition against the transfer of law firm principals in MRPC 1.10, so long as the acquiring firm establishes or maintains a management system which excludes the affected lawyer from all management responsibility over compromised matters—as by ex-

cluding the disqualified lawyer from meetings which affect such matters—then an otherwise proper Chinese wall should still achieve sanction and avoid disqualification. See *Sunkist Growers, Inc v. Benjamin H Ansehl Co,* 221 USPQ (BNA) 1077 (Comm'r Pat, 1984). Absolute firm disqualification may thus potentially be avoided, at least where only one partner is involved, depending on the size of the acquiring firm and the number of principals in it. *The Chinese Wall Defense to Law Firm Disqualification,* 128 U Penn L Rev 677, at n 158 (1980).

This provides an answer to the lawyer's subsidiary inquiry as to the length of time any screening procedures must remain in place; there can be no firm and fast rule, and each case must turn on its own facts. At least in the medical malpractice context, where the lawyer's former clients are hospitals, the screening procedures may have to remain in place indefinitely, until the passage of time obviates any possibility that the lawyer could use the confidences of former clients in aid of their adversaries, namely, in aid of clients of the plaintiff firm. New associates of the plaintiff firm must be made aware of the Chinese wall, and of their ethical obligation in that respect, as soon as they join the firm. Note, however, that in general, if new representation, even though involving litigation against a former client, does not implicate client confidences or secrets, then conflict of interest considerations would not ordinarily preclude the law firm from undertaking such new representation. *Feaheny v. Caldwell,* 175 Mich.App. 291, 308–309 [437 N.W.2d 358] (1989), citing MCPR DR 5–105 and MRPC 1.7, 1.9, 1.10, 1.12, 1.13, and 2.2.

On the other hand, with respect to product liability insurer clients, any confidences the lawyer acquired would more likely be case-specific, and there would be no carryover as to future cases. But a particular insured party might have imparted secrets to the defense firm, and presumptively to the lawyer, which could be turned against it, requiring that the lawyer and the plaintiff firm remain alert to possible disqualification situations, and invoke their screening procedures immediately whenever such situations arise.

In other respects, the proposed screening procedures, and segregation of earned fees, by which the plaintiff firm proposes to erect a Chinese wall between itself and the lawyer, as described, with modifications in terms of physical file separation and security and dissemination of information regarding the Chinese wall among existing and subsequently associated plaintiff firm members, must comport with the requirements set forth in the developed case law which is engrafted into the screening and fee apportionment requirements of MCR 1.10(b)(1).

With the screening procedures in place, the lawyer, if associated with the plaintiff firm, should consider the lawyer disqualified from all pending cases in which the defense firm represents a client and in which secrets acquired in the course of that form of representation might be used against the client, and from future cases involving clients as to whom the lawyer had personal or supervisory involvement.

Where the lawyer is thus disqualified, the lawyer may nonetheless avoid the disqualification, and undertake representation in situations otherwise barred, when the disqualification relates to possible use of confidences or secrets of former clients, provided that those former clients consent, after full disclosure, to the representation. MRPC 1.6(c)(1). In this respect, information the lawyer acquired in the course of assigning matters to junior lawyers in the defense firm might not be either confidences or secrets as defined by MRPC 1.6(a). For example, where the only information acquired by the lawyer was a copy of a filed complaint forwarded to the defense firm by the client, since a filed complaint is, by its nature, both a public and a published document, there would thus be nothing confidential or secret. Insufficient information has been provided as to whether the lawyer might, in a particular situation, have first discussed such matters with the client, and thus engendered confidentiality if not secrecy, before fulfilling the lawyer's assignment function as a principal in the defense firm.

Based on the foregoing analysis, we conclude that the screening and fee segregation procedures envisaged by the plaintiff firm satisfy the requirements of MRPC 1.10(b)(1), that prompt *sua sponte* disclosure to affected tribunals is required by MRPC 1.10(b)(2), and that the Chinese wall thus erected must remain in place for as long as necessary to assure that the lawyer does not use the confidences and secrets of former clients, or of past, present, or future (e.g., repeat) clients of the defense firm, against them in violation of MRPC 1.6 or 1.9(b). In evaluating the lawyer's ethical obligations *vis-a-vis* such future adversaries, the lawyer must be cognizant of a special status as a former principal in the defense firm, by virtue of MRPC 5.1(c)(2).