FEAHENY v CALDWELL

Docket No. 97770. Submitted October 4, 1988, at Detroit. Decided February 23, 1989. Leave to appeal applied for.

Thomas J. Feaheny brought an action for damages in Wayne Circuit Court against Philip Caldwell, chairman of the board of Ford Motor Company, and Harold A. Poling, Harold C. Mac-Donald, John McDougall, Louis Ross and Peter J. Sherry, vice-presidents of Ford Motor Company, alleging conspiracy, tortious interference with his employment contract with Ford Motor Company and tortious interference with his economic expectancy with respect to his employment with Ford Motor Company. Proofs at trial showed that, shortly after plaintiff was made a vice-president of Ford Motor Company in 1977, a reorganization of the company took place. Plaintiff was critical of certain aspects of the reorganization plan and voiced his disapproval of those aspects of the plan. As a result of plaintiff's continued criticisms of the reorganization plan, his annual evaluations by various of the defendants contained statements to the effect that he had an attitude problem. In 1980, plaintiff stopped getting merit pay increases and in 1981 and 1982 plaintiff was not awarded stock option benefits. In 1983, after commencing this lawsuit, the company's board of directors unanimously voted to fire plaintiff. Defendants moved for a directed verdict on all liability issues at trial. The trial court, Michael J. Talbot, J., granted a directed verdict on the conspiracy claim and took the motion under advisement as to the tortious interference claims. The jury found no liability on the tortious interference with the employment contract claim, but found that all the defendants, except defendant MacDonald, were liable on the tortious interference with economic expec-

REFERENCES

Am Jur 2d, Attorneys at Law §§ 184-189; Conspiracy §§ 49 *et seq.*; Master and Servant §§ 43 *et seq.*; Torts §§ 23-25.

Modern status of rule that employer may discharge at-will employee for any reason. 12 ALR4th 544.

Liability of third party for interference with prospective contractual relationship between two other parties. 6 ALR4th 195.

Liability for interference with at-will business relationship. 5 ALR4th 9.

tancy claim. The trial court vacated the jury's verdict with respect to finding liability on the expectancy claim and directed a verdict in favor of the remaining defendants on that claim. Plaintiff appealed. Defendants cross-appealed.

The Court of Appeals *held:*

1. While Michigan recognizes an action for tortious interference with the economic expectancy of one's employment even where, as here, the person is employed under an employment-at-will contract, plaintiff's proofs fail to establish any wrongful conduct on the part of defendants such as is needed to support a tortious interference claim under those circumstances. Each of the defendants as part of his employment was obligated to evaluate plaintiff's performance and make recommendations to the board of directors. Plaintiff failed to show that any defendant discharged that duty in a wrongful manner.

2. The question relating to the propriety of the jury instructions is moot.

3. Plaintiff failed to establish a prima facie case of conspiracy.

4. The trial court did not err in refusing to disqualify defendant's trial attorney.

5. The question of the disqualification of the trial judge on any remand is moot.

Affirmed.

1. TORTS — INTERFERENCE WITH BUSINESS RELATIONSHIP.

   The basic elements which establish a prima facia tortious interference with a business relationship are: the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy, knowledge of the relationship or expectancy on the part of the interferer, an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the party whose relationship or expectancy has been disrupted; one is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another.

2. CONTRACTS — EMPLOYMENT CONTRACTS — TERMINATION OF EMPLOYMENT.

   A mere subjective expectation of continued employment will not justify an expectation of termination of employment for cause only.

3. CONTRACTS — EMPLOYMENT-AT-WILL CONTRACTS — INTERFERENCE WITH BUSINESS RELATIONSHIP.

The fact that one is employed under an employment-at-will contract does not preclude the bringing of an action for wrongful interference with that contractual relationship; actions of an employee's superiors taken in accordance with a mandate to exercise independent judgment in evaluating the employee's work performance are not, as a matter of law, the type of wrongful interference necessary to maintain a wrongful interference of contract action.

4. CONSPIRACY — CIVIL CONSPIRACY.

Civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means.

5. ATTORNEY AND CLIENT — CONFLICT OF INTEREST.

It is not error for a trial court to refuse to disqualify a law firm from representing an employor in a lawsuit by an employee against his employer on the basis of conflict of interest where, although a member of the law firm had previously represented the employee in another matter, the prior representation of the employee by the law firm did not result in any confidential information relating to the employee's suit being imparted to the law firm (Code of Professional Responsibility and Canons, DR 5-105).

*James F. Schouman & Associates* (by *James F. Schouman*), and *Kosinski & Moore* (by *Leonard M. Moore*), and *Conway, Bogdanski & Wright* (by *Daniel J. Wright*), of Counsel, for plaintiff.

*Hughes, Hubbard & Reed* (by *Jerome G. Shapiro, Laura Allen* and *Vilia Hayes*), and *Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Kathleen McCree Lewis*), for defendants.

Amicus Curiae:

*Clark, Klein & Beaumont* (by *Dwight H. Vincent* and *J. Walker Henry*), for the Michigan Manufacturers Association.

Before: DOCTOROFF, P.J., and SHEPHERD and R. R. LAMB,* JJ.

SHEPHERD, J. A jury trial was held on Thomas J. Feaheny's claims for conspiracy, tortious interference with his employment contract with the Ford Motor Company, and tortious interference with his economic expectancy stemming from his employment with the Ford Motor Company. A bifurcated trial was held so that liability and damages would be separately tried to the same jury. Defendants moved for a directed verdict on all liability issues at trial. The trial court granted the motion on the conspiracy claim, but took the motion under advisement as to the remaining tortious interference claims. The jury found that defendants were not liable on the tortious interference with employment contract claim but that, except for defendant Harold MacDonald, they were liable for tortiously interfering with plaintiff's expectancy. The trial court vacated the jury's verdict against the remaining five defendants and directed a verdict of no liability in favor of all defendants on the expectancy claim. Plaintiff appeals as of right. We affirm. Defendants have filed a cross-appeal that we do not address because we are affirming the judgment in their favor.

I

Although the majority of the defendants are now retired, they were all top executives of the Ford Motor Company at various times pertinent to this case. Except for defendant Peter Sherry, the vice-president of personnel and organization, each defendant at some time was either a direct superior of plaintiff or had a higher level of managerial

* Circuit judge, sitting on the Court of Appeals by assignment.

responsibility. Plaintiff, himself, was a long-term employee of the Ford Motor Company. In 1977, plaintiff was elected to vice-president and assigned to car engineering for the North American Automotive Operation (NAAO).[1] Beginning with calendar year 1979, the annual performance appraisal of plaintiff deteriorated. In 1980, plaintiff stopped receiving merit increases and, in 1981 and 1982, plaintiff was not awarded stock option benefits. After commencement of this lawsuit in 1983, the board of directors unanimously voted to fire plaintiff.

The six-year interval between plaintiff's advancement to vice-president in 1977 and his discharge in 1983 was a time of significant changes in the company's top executive personnel, the organizational structure of NAAO, and the financial well-being of the company. Some background on these changes is important to an understanding of this case.

In July, 1978, Henry Ford II fired Lee Iaccoca and replaced him with defendant Philip Caldwell, who was made vice-chairman. Later that year, plaintiff's direct superior retired and was replaced by defendant John McDougall. A reorganization plan that affected the engineering and purchasing functions of NAAO was developed during 1978 and was put into effect at the beginning of 1979. Under the plan, certain engineers that previously reported to plaintiff were decentralized so as to have a direct line of reporting to the manufacturing activities for which their work was done. Trial

[1] Under Ford Motor Co.'s organizational hierarchy, the chairman of the board was chief executive officer. Both the vice-chairman and president reported to the chairman. Those executive vice-presidents or vice-presidents in charge of the company's operation, i.e. NAAO, international operations, and other products, reported directly to the president as the chief operating officer. NAAO was subdivided into groups, with plaintiff's direct superior assigned responsibility for one of the groups.

testimony indicated that it was a "divided house" in the automotive industry as to whether engineers should be centralized or decentralized.

Almost immediately after the reorganization plan was implemented, the economic condition of the automotive industry worsened and a great strain was put on management to cut costs. Market conditions were also changing as consumers demanded more fuel efficient vehicles. Plaintiff disagreed with some of the budget cuts that he was expected to make, as well as the organizational changes and their effect on his accountability and job responsibilities.

In September 1979, defendant Louis Ross replaced defendant McDougall as plaintiff's direct superior. Defendant McDougall remained in NAAO at that time, with reporting responsibility to William Bourke, who was then in charge of NAAO. Bourke, who was not a named defendant in this lawsuit, considered engineering's failure to effectively cut costs to be a problem. He called a meeting in November, 1979, to discuss the problem, at which plaintiff expressed his disagreement with the plan for the engineering program. Defendant Ross, characterizing plaintiff's disagreement with management as an attitude problem, expressed this opinion in his first annual performance appraisal of plaintiff. This 1979 appraisal, which was concurred in by defendant McDougall, continued to rate plaintiff's performance as outstanding, but indicated that the "outstanding rating is at the low end of the range resulting from attitude problems displayed in open meetings which indicated nonsupport of NAAO positions."

More changes in top executive personnel occurred in 1980 when Henry Ford II retired and Bourke left. Defendant Caldwell became chairman of the board and Donald Petersen, who was not

named as a defendant in this lawsuit, became president. Defendant Harold Poling replaced Bourke as head of NAAO, while defendant McDougall transferred out of NAAO to head international operations.

Also in 1980, Ross recommended that plaintiff be replaced due to his uncooperative attitude. He submitted the recommendation to defendant Poling, who took it up the chain of command to the president. As a result, plaintiff was removed as vice-president of car engineering in September, 1980, and placed on special research assignment. In December 1980, plaintiff became vice-president of vehicle research. Plaintiff's performance for 1980 was, however, once again prepared by defendant Ross, who opined that plaintiff's performance rating had deteriorated to "s+" (satisfactory plus) as a result of his "negative personal characteristics" and his failure to accept managerial decisions. Defendant Ross concluded that plaintiff "has a keen mind and intellect, and if he can improve his interpersonal relations, his potential would be exceptional." Defendant Poling concurred with the appraisal.

Plaintiff responded to the negative performance rating with a letter in May 1981 stating, in part:

> I believe I have made a significant contribution to the Company during my career. Unfortunately, however, the Company and NAAO have suffered major losses primarily because of management mistakes both of commission and omission over the past 10 years. I became "controversial" during this period because I anticipated most of the changes in the market and other external factors (including government regulation and litigation) and diligently tried to secure management support to anticipate the future better.
>
> If I have failed in my career as I look back at it, it is because I was not more convincing and persis-

tent in my arguments. It is now apparent that my failure to communicate successfully results from a difference in management approach between me and the prevailing Ford top management style.

Despite the change in plaintiff's assignment, he continued to receive his then current salary. Defendant Caldwell, however, did not recommend plaintiff for merit increases or stock option benefits, and the compensation and option committee of the board of directors did not make any such awards to plaintiff. Plaintiff was then seeking other employment, and the possibility of plaintiff's being separated from the company was discussed. Defendant Peter Sherry, as vice-president of personnel and organization, assisted defendant Caldwell in preparing compensation recommendations for executives and also participated in separation negotiations with plaintiff in 1982. Plaintiff's performance appraisal prepared during 1982 for calendar year 1981 showed some improvement as plaintiff's new superior, vice-president W. D. Compton, who was not named as a defendant in this lawsuit, rated plaintiff as "E" (excellent), with a notation that plaintiff must develop a stronger working relationship with other offices in research. Defendant MacDonald, as vice-president of engineering and research staffing, concurred in the appraisal.

Plaintiff commenced this lawsuit on July 28, 1983, while still vice-president of vehicle research. He sought relief on several theories against top executives of the chief executive office (Caldwell), NAAO (Poling, McDougall and Ross at various times), research (MacDonald) and personnel (Sherry). It was, however, president Petersen who recommended to the board of directors that it would be in the company's best interest to fire

plaintiff. The board agreed, and plaintiff was fired. Plaintiff then amended his complaint six times. The three claims upon which the trial was held involved defendants' alleged liability for conspiring to and tortiously interfering with his job responsibilities, compensation rights, and status with the company. In part, the jury was instructed on plaintiff's theory that (1) each defendant's conduct caused the company to breach a contract to give him stock options and merit raises and (2) each defendant interfered with his expectancy that he would receive stock options and raises and that he would continue to be employed.

II

On appeal, plaintiff claims that the trial court erred in directing a verdict in favor of five of the six defendants on their liability for tortiously interfering with his expectancy with the company. In doing so, plaintiff seeks to establish a "parallel" tort separate and distinct from any employment contract he may have had with the Ford Motor Company. For reasons to be discussed, we find no merit in his argument.

Initially, we note that the defendants' motion for directed verdict on plaintiff's expectancy claim was taken under advisement by the trial court and was then granted after the jury returned a verdict in favor of plaintiff. Although a more correct characterization of the court's ruling may be a judgment notwithstanding the verdict, MCR 2.610, the label attached to the judgment is not material as the standard of review is the same.

In reviewing a trial court's ruling on a motion for directed verdict or judgment notwithstanding the verdict, the testimony and all legitimate inferences that may be drawn are viewed in the light

most favorable to the plaintiff. *Matras v Amoco Oil Co,* 424 Mich 675, 681; 385 NW2d 586 (1986). If reasonable jurors could honestly reach different conclusions, the motion should be denied and the case should have been decided by the jury, since no court under such circumstances has authority to substitute its judgment for that of the jury. *Id.,* pp 681-682. If, on the other hand, the evidence is insufficient to establish a prima facie case against the defendants, then the motion should have been granted since reasonable persons would agree that there is an essential failure of proof. *Bullock v Gulf & Western Mfg,* 128 Mich App 316, 319; 340 NW2d 294 (1983).

The trial court here directed a verdict in favor of defendants on several bases. We uphold the trial court's decision to direct the verdict in favor of defendants on the basis that the proofs were insufficient to establish the requisite element of wrongful interference.

Plaintiff places much emphasis on the fact that he was attempting to establish defendants' liability for interfering with his employment *expectancy* with the Ford Motor Company (his second tortious interference claim), rather than interference with any specific vested contractual rights. Much emphasis is also placed on the labels given to tortious interference claims by the courts and legal treatises. The labels somewhat justify plaintiff's argument that there should be "parallel" torts for different theories of liability, depending on whether the plaintiff is attempting to establish damages related to a specific contractual right or an expectancy. See 4 Restatement Torts, 2d, §§ 766, 766B, pp 7-17, 20-23 (intentional interference with performance of contracts as distinguished from intentional interference with prospective contractual relations); *Formall, Inc v*

*Community National Bank,* 166 Mich App 772; 421 NW2d 289 (1988) (tortious interference with contractual relations); *Bonnelli v Volkswagen of America, Inc,* 166 Mich App 483, 496-497, n 4; 421 NW2d 213 (1988), lv den 430 Mich 896 (1988) (tortious interference with an existing contract as distinguished from tortious interference with an advantageous business relationship); *Joba Construction Co, Inc v Burns & Roe, Inc,* 121 Mich App 615, 634; 329 NW2d 760 (1982) (tortious interference with advantageous business relations or prospective economic relations).

Despite the difference in labels, Michigan law is clear that there is at least one distinct tort where the alleged tortfeasor instigates a breach of contract, *Bonnelli, supra,* p 496, and another distinct tort where the alleged tortfeasor interferes with an advantageous relationship, whether or not based upon a contract, which causes damage. As was stated in *Northern Plumbing & Heating, Inc v Henderson Bros, Inc,* 83 Mich App 84, 93; 268 NW2d 296 (1978), lv den 405 Mich 845 (1979), quoting 45 Am Jur 2d, Interference, § 50, p 322:

> "The basic elements which establish a prima facie tortious interference with a business relationship are the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another."

Hence, the threshold question that must be resolved for plaintiff to proceed on any theory of tortious interference is what type of relationship exists. The evidence in this case was quite clear that the plaintiff had an employment relationship with the Ford Motor Company and that the nature of the relationship was a contract terminable at will. Although plaintiff asserts on appeal that he had a "secure employment contract (dismissal only for just cause)" under *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), this, at best, was a subjective expectation. A mere subjective expectation of continued employment will not justify an expectation of termination for cause only. *Dzierwa v Michigan Oil Co,* 152 Mich App 281, 285; 393 NW2d 610 (1986). Even in his sixth amended complaint, plaintiff admitted that he served at the sole discretion of the board of directors to elect or remove him. Viewed most favorably to plaintiff, the trial evidence established nothing more than an at-will employment contract for all executives serving at the vice-president level or higher. Although the specific terms of the contract, i.e., compensation benefits, may vary from time to time, this was a contract that would either continue indefinitely or cease upon plaintiff's separation from the company. Accordingly, we hold that plaintiff failed to establish a prima facie case of a just cause contract. The only issue that arguably should have been submitted to the jury was whether defendants tortiously interfered with his at-will employment contract. There was no cognizable tortious interference cause of action existing independently of that contract.

The next question we must resolve is whether there can be interference with an employment

contract that is terminable at will. We answer this question in the affirmative.

At-will employment contracts have posed some analytical difficulties in tortious interference cases, particularly where an employee seeks damages caused by his discharge. When viewed under the tortious interference cause of action requiring a breach of contract, the courts have held that a discharge from employment is an insufficient basis upon which to establish the claim since no breach arises from the termination. *Dzierwa, supra,* p 287; and see *Woody v Tamer,* 158 Mich App 764, 770; 405 NW2d 213 (1987). On the other hand, when viewed as a subsisting relationship that is of value to the employee and will presumably continue in effect absent wrongful interference by a third party, the majority opinion in *Tash v Houston,* 74 Mich App 566, 569-570; 254 NW2d 579 (1977), lv den 401 Mich 822 (1977), held that an at-will contract is the proper subject of an actionable tortious interference claim. Under this view, the employee has a manifest interest in the freedom of the employer to exercise his or her judgment without illegal interference or compulsion and it is the unjustified interference by third persons that is actionable. *Id.,* p 570. This Court recently clarified the types of conduct that are actionable in a tortious interference case in *Formall, supra.* Hence, the third party must intentionally do an act that is per se wrongful or do a lawful act with malice and that is unjustified in law for the purpose of invading the contractual rights or business relationship of another. 166 Mich App 779-780. While *Formall* involved a non-employment situation, we find its holding applicable to employment relations as well.

4 Restatement Torts, 2d, § 766, comment (g), pp 10-11, similarly takes the position that an at-will

contract can be improperly interfered with, but that the fact that the contract is terminable at will makes it closely analogous to interference with prospective contractual relations claims and is a factor to be taken into account in determining the damages. Improper conduct comes within the ambit of a wrongful act. It means illegal, unethical or fraudulent conduct. *Formall, supra.*

We agree with the rationale of the Restatement and *Tash* and, therefore, hold that an at-will employment contract is actionable under a tortious interference theory of liability. There are, of course, other terms in the employment contract beside the termination clause. Some contractual rights will vest as the employee performs under the contract and becomes entitled to compensation for his or her services. Other interests in the at-will contract rest primarily in the future relations between the parties, although the employee has no legal assurance of them. Since we are here faced only with a question of defendants' liability, we express no view on what damages, if any, plaintiff could recover for tortious interference with the contract. We hold only that tortious interference with an at-will contract is actionable. The basis of our holding is that an at-will employee who enjoys the confidence of his or her employer has the right to expect that a third party will not wrongfully undermine the existing favorable relationship.

Next, we turn to the question of whether plaintiff established a prima facie case against the five defendants (Caldwell, Poling, McDougall, Ross, and Sherry) for tortiously interfering with his at-will employment contract. The terms of the contract upon which plaintiff's expectancy claim were based focused on his compensation expectations, i.e., future stock options and merit increases, and his expectations regarding his continued employment.

The obstacle that plaintiff faced was to establish wrongful interference on the part of the five defendants. As noted above, this required proof that each defendant did per se wrongful acts or did lawful acts with malice and without justification. *Formall, supra.* Also required was proof, with specificity, of affirmative acts by the defendants which corroborated the unlawful purpose of the interference. *Formall, supra,* p 779. Further, since all five defendants were corporate officers, plaintiff faced the very difficult obstacle of showing that each defendant stood as a third party to the employment contract at the time he allegedly performed the acts. This is so, because, as corporate officers, the defendants served as agents whose acts were privileged when acting for and on behalf of the corporation, rather than acting to further strictly personal motives. *Tash, supra,* pp 572-574.[2]

Except for defendant Sherry, all of the defendants here were superiors of the plaintiff whose responsibilities required them to exercise their independent judgment in evaluating plaintiff's performance and in making recommendation to the board of directors. Viewed most favorably to plaintiff, the evidence failed to demonstrate that any of the defendants acted out of a personal motive to harm plaintiff or to otherwise acquire pecuniary advantage. Their opinions and actions taken regarding how the company should be organized, plaintiff's job performance and whether plaintiff should be recommended for stock options and

[2] We note that this case is distinguishable from *Dzierwa, supra,* pp 287-288, wherein this Court found the identity between the defendant and the corporation so close that the defendant was treated as the corporation for purposes of the employee's tortious interference case. The rationale of *Dzierwa,* hence, seems more akin to an application of the "piercing the corporate veil" doctrine. See *Kline v Kline,* 104 Mich App 700, 702-703; 305 NW2d 297 (1981). This doctrine is inapplicable to this case, which focuses on the conduct of corporate officers acting as agents of the corporation.

merit increases were judgments that they had a right to make as corporate officers. Although plaintiff argues that defendants falsified records, the evidence presented failed to establish any material falsification of facts pertaining to plaintiff's employment. At best, plaintiff established that the specific position objectives listed on his 1980 performance appraisal were not the same as the objectives that plaintiff had established for the year. However, the appraisal made by Ross indicated that the objectives listed were met or exceeded and, hence, plaintiff failed to establish that he was harmed by the alleged change. Plaintiff's deteriorating performance ratings stemmed from defendant Ross's opinion (as contrasted to false statements of fact) on the way that plaintiff was interacting with other members of the management team. The fact that plaintiff's managerial style differed from his superiors was clear from the evidence, as well as plaintiff's own admissions. Plaintiff's opinion regarding how management should behave and what decisions would have been in the best interest of the company may or may not have been better from an objective standpoint. However, defendants were elected by the board to make those decisions, and it is not the task of the courts or jury to evaluate the business judgment of a corporation's top executives.

It is one thing for a person outside the corporation to come in and poison the minds of the board of directors with negative opinions about one of its top executives. It is another thing for plaintiff's superiors to execute their independent judgment to give negative appraisals to the board of directors, to decide that plaintiff should not be recommended for merit increases or other benefits, and to work towards a reorganization of the company

that may adversely affect plaintiff's job responsibilities and opportunities.

After a careful consideration of the trial record, we hold that plaintiff failed to establish a prima facie case against any of the defendants. Although the actions taken by defendants did amount to interference with his expectations under the at-will employment contract, their actions did not fit into the category of the wrongful interference that is required to maintain a tortious interference cause of action. Hence, there was no liability as a matter of law.

## III

Plaintiff also seeks reversal on the basis that the trial court's instructions on the first of his two tortious interference claims was erroneous. We have found that plaintiff failed to establish a prima facie case of conduct on the part of defendants that amounted to a tortious interference with the at-will employment contract. Since neither of plaintiff's tortious interference claims should have been submitted to the jury, we decline to review this alleged instructional error.

## IV

Plaintiff next claims that the trial court erred in directing a verdict in favor of defendants on the conspiracy claim. A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means. *Temborius v Slatkin,* 157 Mich App 587, 599-600; 403 NW2d 821 (1986). Viewed most favorably to plaintiff, the evidence here showed only that defendants took actions or

made decisions as members of the company's management team that affected plaintiff's job responsibilities, status with the company, and compensation. A prima facie case of a conspiracy between any of the defendants was not established. Accordingly, we affirm the trial court's grant of a directed verdict in favor of defendants.

V

Plaintiff also claims that his pretrial motion to disqualify the law firm that represented defendants at trial was improperly denied. Plaintiff argues that the law firm should have been disqualified under Code of Professional Responsibility and Canons, DR 5-105, on conflict of interest grounds because an attorney of the law firm previously represented him in a related matter. We disagree.

DR 5-105 provides that a lawyer should refuse to accept or continue employment if the interests of another client may impair the lawyer's independent professional judgment. However, a lawyer may bring an action against a former client if all business relations between the lawyer and client have ceased. Formal Ethics Opinion 7 (October, 1936). Here, the record indicates that plaintiff knew that the law firm represented the Ford Motor Company at the time that he contacted the law firm in 1982. Plaintiff was briefly represented by an attorney of the law firm in connection with a business acquisition he was contemplating as a possible solution to his separation from the Ford Motor Company. The relationship between plaintiff and the law firm ceased prior to the law firm undertaking to represent the individual defendants in this law suit. Plaintiff's contemplated business acquisition was not substantially related to his law suit against the individual defendants,

and there was no evidence that plaintiff imparted confidential information to the attorney regarding the instant law suit. In sum, we can find no support for plaintiff's claim that the law firm should have been disqualified under DR 5-105.[3]

Further, we note that the relief that plaintiff seeks for the court's failure to disqualify the law firm is reversal and a new trial. Such relief is only justified where the refusal to do so would be inconsistent with substantial justice. MCR 2.613(A).[4] There being no evidence of a violation of DR 5-105 or prejudice caused by the court's ruling so as to justify a new trial, we affirm the judgment of no liability.

## VI

Finally, plaintiff seeks a disqualification of the trial judge in the event that we remand for a new trial. On the one hand we note plaintiff's request for disqualification is one that must first be decided by the challenged judge. MCR 2.003(C)(3). On the other hand, an appellate court may remand to a different judge if the original judge would have difficulty in putting previously expressed views or findings out of his or her mind, if reassignment is advisable to preserve the appearance of justice,

---

[3] Effective October 1, 1988, the Michigan Rules of Professional Conduct replaced the Code of Professional Responsibility. The standards of conduct previously governed by DR 5-105 are now found in Rules 1.7, 1.9, 1.10, 1.12, 1.13 and 2.2.

[4] The two cases relied on by plaintiff do not support his request for a new trial inasmuch as the cases did not involve the review of a judgment rendered on the merits of civil litigation as in this jury-tried case. See *GAC Commercial Corp v Mahoney Typographers, Inc*, 66 Mich App 186; 238 NW2d 575 (1975); *Auseon v Reading Brass Co*, 22 Mich App 505; 177 NW2d 662 (1970). As noted in *State Appellate Defender v Saginaw Circuit Judge*, 91 Mich App 606, 608; 283 NW2d 810 (1979) (a criminal appellate case), the standard applied in determining what relief is warranted may very well depend on whether the alleged conflict of interest is presented to this Court as an interlocutory matter or upon a review of the merits of the case.

and if reassignment would not entail excessive waste or duplication. See *People v Evans,* 156 Mich App 68; 401 NW2d 312 (1986). In any event, our holding that plaintiff is not entitled to a new trial renders this issue moot.

To summarize, we affirm the judgment of no liability because plaintiff failed to establish a prima facie case of conduct on the part of the defendants that amounted to tortious interference with his at-will employment contract or a civil conspiracy.

Affirmed.