**Mary Ann SAHADI, Plaintiff,**

v.

**PER–SE TECHNOLOGIES, INC., PST Services, Inc, and Linda Cascante, Defendants.**

No. 02–73734.

United States District Court, E.D. Michigan, Southern Division.

Aug. 21, 2003.

Benjamin J. Aloia, Beeding & Hacker, Mount Clemens, MI, for Plaintiff.

James F. Hermon, Dykema Gossett, Detroit, MI, Robert P. Riordan, Lisa M. Durham, Alston & Bird, Atlanta, GA, for Defendants.

*MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS PER–SE TECHNOLOGIES AND PST SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT LINDA CASCANTE'S MOTION FOR SUMMARY JUDGMENT*

COHN, Senior District Judge.

### I. Introduction

This is an employment case under the Family Medical Leave Act, 29 U.S.C. § 2601 (FMLA). Plaintiff Mary Ann Sahadi (Sahadi) is suing defendants Per–Se Technologies (Per–Se), PST Service's Inc.[1] and Linda Cascante (Cascante) claiming that she was wrongfully terminated from her employment for attendance violations. Sahadi says some of her absences were the result of her husband's medical condition and therefore protected by the FMLA. Sahadi claims (1) violations of the FMLA (against Per–Se), (2) intentional interference with contract (against Cascante), and (3) breach of employment contract (against Per–Se).

Before the Court are Per–Se and Cascante's motions for summary judgment.[2]

---

**1.** On June 30, 2003, the Court granted Sahadi's motion to file an amended complaint to add PST Services, Inc. as a defendant. Thereafter, Sahadi filed a Second Amended Complaint joining PST Services, Inc. to which PST Services, Inc. filed an answer.

**2.** Also before the Court is PST Services, Inc.'s motion for summary judgment. PST Ser-

Following oral argument, the Court directed the parties to file supplemental papers addressing the Court's concerns. Although the parties filed supplemental papers, the papers did not directly speak to the Court's concerns. In any event, the matter is now ready for decision. For the reasons that follow, Per–Se and PST Service's Inc.'s motion is GRANTED IN PART AND DENIED IN PART and Cascante's motion is GRANTED. Only Sahadi's FMLA claims against Per–Se and PST Services, Inc. continue.

## II. Background

The material facts as gleaned from the parties papers follow.

Per–Se is engaged in the business of medical billing and collection services and technology to hospitals, physician groups, and individual physicians.

Sahadi was hired by Medaphis Physician Services Corporation in 1995 as a payment processor. In 1999, Medaphis and PST Services, Inc., a subsidiary of Per–Se, combined operations.[3] Sahadi primarily performed data entry and processing medical bill payments. As reflected in her employment application and employee handbook, Sahadi's employment was at-will.

Sahadi initially reported to Diana Molnar. In 1999, she began reporting to Cascante. Cascante reported to Tanya Kotwica, Director of Operations. Kotwica had the ultimate authority over Sahadi's employment.

Sahadi had a history of attendance issues during her employment. In Sahadi's first performance plan/review, dated August 7, 1996, she was counseled to not exceed her sick and vacation time. The review noted that Sahadi had used sick and vacation time "due to her husband being ill."[4]

On April 30, 1997, Sahadi received a disciplinary warning for her attendance, noting that "Mary has had 9 occurrences in a 12 month period." Under the heading "Improvement Required" it states that "Mary must schedule her time as accrued and not use more time than she is allowed." The warning also says that "Mary may be terminated the next time unscheduled time is taken." Attached to the warning on a paper entitled "employee reply" is the handwritten notation "Not interested in family leave at this time." Molnar testified at deposition that she and Sahadi discussed family medical leave when Sahadi was issued the warning and that Sahadi declined to take leave. The paper is signed by Sahadi. Also attached is a copy of Per–Se's attendance policy. It states that nine unscheduled absences in a twelve month period could result in termination.

Sahadi's August 20, 1997 performance review states that "Mary does not maintain a positive attendance record. A write-up was done on April 30, 1997 for nine occurrences in a twelve month period." This review also reflected problems with Sahadi's work performance and noted that "if polices and procedures [relating to her work] were not followed, Mary may be terminated."[5]

On June 1, 1998, Sahadi notified Per–Se of a need to take family/medical leave due to a sprained ankle. On June 2, 1998,

vices, Inc. is a wholly owned subsidiary of Per–Se. PST Services, Inc. has joined in Per–Se's motion. It did not file a substantive brief.

3. Although part of Sahadi's employment was with Medaphis, for simplicity the Court will refer to her employer as Per–Se.

4. Apparently, Sahadi's husband has been in ill health for some years. However, his health did not become an issue in terms of the FMLA until 2001, as will be explained.

5. The record also contains several written warnings in 1999 for performance problems.

Sahadi was given a memorandum from Per–Se which detailed her leave, that it was covered by the FMLA, as well as detailing Per–Se's FMLA policy.

There are no reported attendance problems until 2001. These problems are discussed below.

Over three years later, on February 7, 2001, Sahadi came home to find her husband unconscious. He was taken to the hospital and placed on life support for 2½ days.[6] On February 9, her husband started breathing on his own. Sahadi has had to care for him since that time with various doctor and hospital appointments.

Following her husband's hospital stay, Sahadi testified at deposition that she asked Kotwica (she does not recall if Cascante was there) if instead of taking her prescheduled vacation she could take vacation days as needed. Sahadi said that she was told that would be okay. She also stated that she did not ask about family medical leave and no one said anything about it at that time. She explained at deposition that she wanted to take her vacation days sporadically when her husband needed her.

According to a Kronos form[7] Sahadi took vacation days on March 26, 2001 and March 28, 2001. The handwritten notation for these days says "Husband in and out of hospital."

On May 21, 2001, Sahadi was given a formal warning regarding her attendance. The warning states that she had seven unscheduled occurrences in 2001. The warning also states that "Mary cannot have any more unscheduled time off for the next three months" and that "[i]mme-

diate improvement is required in regards to your excessive call ins. If this is not followed immediate termination will occur." Cascante, her then supervisor, issued the warning. Sahadi signed the warning. The seven unscheduled occurrences, appearing as handwritten notations on Sahadi's attendance card attached to the warning are for the following dates:

January 8, 2001 called in ill

March 5, 2001 called in ill as pad [sic] as vacation

March 6, 2001 called in ill paid 6 sick and 2 vacation

March 23, 2001 called in ill paid as vacation

March 26, 2001 called in ill paid as vacation

May 7, 2001 called in ill

May 14, 2001 called in ill

The only Kronos forms in the record which covers any of these dates is March 26 in which Sahadi took time to care for her husband. March 28, 2001, a day Sahadi also took off to care for her husband, is not however included as a listed unscheduled absence.

According to another attendance card, on September 21, 2001, Sahadi failed to appear for work or call in to report her absence. Cascante and Kotwica discussed Sahadi's attendance problems and Kotwica decided that dismissal was warranted. Apparently, after the May 2001 moratorium on taking unscheduled time off, Sahadi continued to miss work on the following days (as reflecting in the attendance card):

June 15, 2001 took husband to hospital

June 18, 2001 called in ill[8]

---

**6.** Sahadi refers to her husband being "dead" these 2½ days.

**7.** "Kronos" is the name of a software system that Per uses to track employee work time. When an employee is absent, a Kronos form is usually submitted so that the computer

records can track employee use of sick, vacation, holiday, and other time.

**8.** The record contains a Kronos form for June 18, 2001. It states that Sahadi took 8 hours of vacation because her "car broke down" and "husband in hospital."

July 20, 2001 called in ill

July 23, 2001 called in ill paid as vacation

Week of July 18 short time (less than 40 hours)

September 18, 2001 came in at 11:27 doc. appointment

On October 9, 2001, Cascante and Kotwica met with Sahadi to discuss her absenteeism and the intent to terminate her employment. At this meeting, Sahadi testified at deposition that she told Cascante and Kotwica that her husband "was sick and ill." Sahadi asked for another chance.

Sahadi, Cascante and Kotwica prepared a memorandum which is attached as Exhibit A reflecting the attendance guidelines Sahadi would be required to follow or face termination. The following dates were noted in the memorandum as dates where Sahadi violated her "probation" by taking unscheduled time off:

June 15, 2001 leaving early

June 18, 2001 calling in ill

July 20, 2001 calling in ill

July 23, 2001 calling in ill

July 18, 2001 being short work hours

September 18, 2001 came in late

September 21, 2001 failed to show or call

October 8, 2001 left 45 min. early

October 9, 2001 did not report until 11:30am

The memorandum also states that "Mary has no sick or vacation time left and is not to take anytime unless it is approved and accrued."

The agreed upon "guidelines" were:

1. Report to work between 6:30 and 6:30—no later

2. Make sure to work 40 hours a week—80 hours a pay period

3. Cannot take any time off except for what time has accrued and the time must be prescheduled

4. Sahadi cannot write time manually on time sheet—must use punch clock

5. Failure to follow the guidelines will result in termination

On December 6, 2001, Sahadi called in sick. She testified at deposition that she could not work because she was in fact sick, i.e. not because of her husband. She did not see a doctor. Cascante then reviewed Sahadi's time records and discovered that she only had 6.2 hours in her sick bank. Cascante informed Kotwica. Kotwica decided to terminate Sahadi the next day.

Because Kotwica was not going to be in the office the next day, Kotwica asked Cascante to communicate the termination in the presence of another supervisor and to prepare a letter for Kotwica's approval. The letter states:

On October 9, 2001, a formal employee performance improvement review was given to Mary Sahadi. Upon her last appraisal, under the expected level of performance/conduct section of the appraisal form, it indicated that Mary can only utilize sick accrued for sick time and vacation must be approved, accrued and to be used as vacation only. It also stated under the agreed upon guidelines: Mary cannot take any time off except only for what is accrued and the time must be pre-scheduled. It also stated failure to follow the guidelines or deviate in anyway would result in termination.

On December 6, 2001, Mary called into work, a full 8 hours. Her accrued time for sick was only 6.2 hours she did not accrue enough sick time for her 8 hour call in.

Today December 7, 2001 because Mary did not accrue 8 hours of sick she will be terminated.

The letter is signed by Cascante and Hope Hollis, another apparent supervisor. Sahadi did not want to sign the letter.

When asked at deposition whether Sahadi said anything about her husband and his health at the meeting, she replied:

> Only that they have known that my husband was sick the whole time and I had a lot of problems and that was a lot of the reasons why my days off were what they were.
>
> . . .
>
> I turned to Hope and I said do you realize that my husband died in February[9] and a lot of the days I took off were because of him? And she didn't say anything. She didn't know me.

Sahadi also asked to speak with a manager however no manager could be found that day. Sahadi did not contact a manager after her termination.

On January 4, 2002, counsel for Sahadi wrote to Per–Se stating that Sahadi was terminated improperly because she did have enough time accrued to call in sick on December 6, 2001. A Human Resources Manager for Per–Se reviewed Sahadi's time records and wrote to Sahadi's counsel stating in part:

> The results of my investigation concluded that there was a miscalculation in Mary Sahadi's bank accruals, which would have left her with a balance of 9.276 hours of paid time off. However, Mary did receive sick pay for her absence on December 6, 2001. Due to the timing of her termination, Mary was not eligible to accrue additional time.
>
> On October 9, 2001 guidelines were clearly outlined in a meeting with Mary and her supervisors, Linda Cascante and Tanya Kotwica. In that discussion, Linda and Tanya informed Mary that she would be terminated if she took any time off that was not prescheduled. Also in that meeting, Mary received a written warning stating that if Mary failed to complete a 40–hour workweek in the next three months, *immediate termination would occur.* Mary had previously received a written warning on May 32, 2001 for excessive absenteeism, which also stated that she could be terminated if her behavior did not improve. In Conclusion, Mary Ann Sahadi was clearly terminated "for cause" due to her chronic attendance problems.

On August 27, 2002, Sahadi filed a complaint against Per–Se and Cascante.

### III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a trier of fact or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.,* 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 101 (6th Cir. 1995). Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.

---

9. See n. 6, *supra.*

*Thompson v. Ashe,* 250 F.3d 399, 405 (6th Cir.2001).

### IV. Per–Se's Motion

#### A. Parties' Arguments

Per–Se argues that summary judgment is appropriate because (1) Per–Se was not her employer, (2) there was no FMLA violation because (a) Sahadi's termination followed an undisputedly unprotectable absence (her December 6, 2001 illness), (b) there is no evidence that Sahadi availed herself of any right protected by the FMLA prior to her termination, (c) Sahadi was terminated for a legitimate non-retaliatory reason and there is no evidence of pretext, (3) Sahadi was an at-will employee and even if her employment was for cause, she was terminated for cause.

Sahadi argues that (1) there is an issue of fact as to whether Per–Se was Sahadi's employer, (2) there are issues of fact as to whether Per–Se violated the FMLA when it terminated her employment, (3) Per–Se was prohibited from taking any adverse action against Sahadi because it never posted the required FMLA notice, (4) there are factual questions as to whether Sahadi was terminated because of her FMLA protected absences, and (5) there are factual questions as to whether Per–Se and Sahadi entered into a just cause employment contract on October 9, 2001.

### V. Cascante's Motion

Cascante argues that Sahadi cannot prevail on her claim of intentional interference with employment relationship (the only claim plead against Cascante) because there is no evidence of any contract and no evidence that Cascante engaged in any tortious conduct when she issued authorized discipline to Sahadi and informed her of the decision to terminate her employment.

Sahadi argues that the October 9, 2001 just cause employment contract provides a basis for her interference claim. Sahadi alternatively argues that even if Sahadi's employment was at will, she still has a claim against Cascante. Sahadi also argues that there are genuine issues of material fact as to whether Cascante's conduct toward Sahadi constitutes intentional interference with an employment relationship.

### VI. Analysis

#### A. Correct Defendant

Per–Se argues that summary judgment is appropriate because it is not Sahadi's employer, rather PST Services, Inc., a wholly owned subsidiary is her employer. Sahadi says there are issues of fact as to who is her employer.

This argument lacks merit. As stated at the hearing on the parties' discovery motions, including a motion by Sahadi to add PST Services, Inc. as a defendant, Per–Se is a proper party in this case. Notably, Per–Se has argued the merits of Sahadi's claims. PST Services, Inc., recently appearing in this matter, is represented by the same counsel as Per–Se. While it appears that PST Services, Inc. is Sahadi's true employer, as Per–Se is merely a holding company, Per–Se has represented PST Services, Inc.'s position in this case. Thus, it makes little difference whether Per–Se or PST Services, Inc. is the defendant. As counsel for both Per–Se and PST Services, Inc. admitted at oral argument, both companies are viable and presumably collectable.

#### B. FMLA Claims

##### 1. FMLA in General

Under the FMLA, an eligible employee is entitled to take up to twelve weeks of leave during any 12–month period for one or more of the following reasons:

  (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612. Following FMLA leave, the employee is entitled to be reinstated to his former position, or a substantially similar position. 29 U.S. C § 2614(a). The FMLA prohibits employers from interfering with, restraining, or denying the exercise of these rights. 29 U.S.C. § 2615(a)(1). An employer who interferes with an employee's rights under the FMLA may be held liable in a civil suit. *See* 29 U.S.C. § 2617; *Miller v. Defiance Metal Prods., Inc.,* 989 F.Supp. 945, 946 (N.D.Ohio 1997)

Here, Sahadi says that Per–Se has violated the FMLA in two ways—by not granting her FMLA leave and by terminating her because of her protected absences.

### 2. Not Granting FMLA leave

▮ In order to trigger application of the FMLA, an employee must provide her employer with notice that she needs FMLA-qualifying leave. *See, e.g., George v. Associated Stationers,* 932 F.Supp. 1012, 1016 (N.D.Ohio 1996). To satisfy this requirement, the employee need not expressly invoke her FMLA rights, but need only request leave for one of the above reasons. 29 C.F.R. § 825.303(b) (stating that an "employee need not expressly assert rights under the FMLA, or even mention the FMLA, but may only state that leave is

needed"). *See also George,* 932 F.Supp. at 1016 (stating that the employee is "not required to assert rights under the Act"); Przybylowicz, Calzone, and Kopka, *Employment Litigation in Michigan,* Inst. Continuing Legal Educ. § 12.36 (1999 & Supp.) The burden then shifts "to the employer to determine whether leave was sought under the Act and to obtain any additional information." *George* at 1016. If the employer requires medical certification, it is required to so inform the employee. *Id.*

Per–Se concedes that Sahadi missed work on occasion due to her husband's health condition. They also do not appear to dispute that her husband had a serious health condition.[10] Thus, the issue for this claimed violation of the FMLA is whether Sahadi gave proper notice of her FMLA rights.

Per–Se argues that Sahadi did not engage in any protected activity, *i.e.* she did not invoke her FMLA rights because she never requested FMLA leave. This argument, however, ignores that a plaintiff, such as Sahadi who is requesting intermittent unforeseeable leave, need not specifically state that they are invoking the FMLA. While Sahadi testified that she did not ask for FMLA leave when she first spoke with Kotwica or at any time thereafter, it is not her obligation to explicitly request FMLA leave. Rather, she need only put Per–Se on notice that her absences may be protected. Indeed, as one judge in the district has stated, in a case cited by Per–Se:

The employee need not expressly invoke the FMLA to her employer in order to meet the notice requirement. "Once an employer is given notice that an employee is requesting leave for a FMLA-quali-

---

**10.** A "serious health condition" is defined as "an *illness, injury, impairment,* or *physical or mental condition* that involves (A) inpatient care in a hospital . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

fying reason, the employer bears the obligation to collect any additional information necessary to make the leave comply with the requirements of the FMLA." *Hammon v. DHL Airways, Inc.,* 165 F.3d 441, 450 (6th Cir.1999). *Burke v. Health Plus of Michigan, Inc.,* 2003 WL 102800, *5 (E.D.Mich.) (Lawson, J.).

Indeed, when leave is not foreseeable, as in the case of an emergency room visit, applicable regulations provide that the employee need not invoke the FMLA explicitly, but must notify his employer that leave is required. It is then up to the employer to investigate the matter further. 29 C.F.R. § 825.303. *Taylor v. Invacare Corp.,* 64 Fed.Appx. 516, 518–20 (6th Cir. 2003). 29 C.F.R. § 825.303(a) states:

> When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

*See also Employment Litigation in Michigan, supra* at § 12.34.

█ Here, Sahadi testified at deposition that following her husband's hospitalization, she asked Kotwica (she does not recall if Cascante was there) if instead of taking her prescheduled vacation she could take vacation days as needed. Sahadi said

that she was told that would be okay. She also stated that she did not ask about family medical leave and no one said anything about it at that time. She explained at deposition that she wanted to take her vacation days when her husband needed her. Per–Se does not argue that such a conversation did not take place and they do not address this conversation in their papers.

Based on this conversation, a jury could find that Sahadi invoked her FMLA rights by providing sufficient notice to her employer that she would need time off in order to care for her husband. Once on notice, it became Per–Se's obligation, not Sahadi's, to determine whether her time off is FMLA-qualifying.

It should be noted that the fact Sahadi informed Per–Se that her time off would be intermittent does not mean that is was not FMLA-qualifying. Section 2612 provides in relevant part:

> (b) Leave taken intermittently or on reduced leave schedule
>
> (1) In general
>
> Leave under subparagraph (A) or (B) of subsection (a)(1) of this section shall not be taken by an employee intermittently or on a reduced leave schedule unless the employee and the employer of the employee agree otherwise. Subject to paragraph (2), subsection (e)(2) of this section, and section 2613(b)(5) of this title, **leave under subparagraph (C)[to care for a spouse or relative] or (D) of subsection (a)(1) of this section may be taken intermittently or on a reduced leave schedule when medically necessary.** The taking of leave intermittently or on a reduced leave schedule pursuant to this paragraph shall not result in a reduction in the total amount of leave to which the employee is entitled under subsection (a) of this section beyond the amount of leave actually taken.

(emphasis added). *See also Employment Litigation in Michigan, supra* at § 12.15.

Sahadi also argues that Per–Se was prohibited from taking any action against her, including denying her FMLA leave, because Per–Se did not post the required notice explaining the FMLA. Under 29 C.F.R. § 825.300(b), an employer who does not post the required notice concerning an employee's rights under the FMLA "cannot take any adverse action against an employee, including denying FMLA leave, for failing to furnish the employer with advance notice of a need to take FMLA leave."

Per–Se disputes Sahadi's deposition testimony and affidavit where Sahadi asserts that Per–Se did not have any FMLA notices. In support, Per–Se offers the affidavit of Kotwica who states that the FMLA policy is posted on an office bulletin board. Because the evidence is conflicting, this also demonstrates that summary judgment is not proper on Sahadi's claim that Per–Se violated the FMLA by not granting her FMLA leave to care for her husband.

Thus, although Per–Se makes much of the fact that Sahadi never requested FMLA leave to argue that Sahadi never invoked her FMLA rights, this argument lacks merit. As explained above, Sahadi was not required to specifically invoke the FMLA. Based on the record, there is a factual question as to whether she invoked the FMLA. Per–Se is therefore not entitled to summary judgment on Sahadi's FMLA claim.

### 3. Retaliation Claim

An employer may not retaliate against an employee for taking leave under the FMLA. 29 U.S.C. § 2615; 29 C.F.R. § 825.220(c); *Chandler v. Specialty Tires of Am. (Tenn.), Inc.,* 283 F.3d 818, 825 (6th Cir.2002). In order to establish a prima facie case of FMLA retaliation, a plaintiff must show "(1) he availed himself of a protected right under the FMLA, (2) he was adversely affected by an employment decision . . . , and (3) the proximity in time between [his] request for leave and his discharge [establishes] a causal connection between his exercise of a right under the FMLA and the adverse employment decision." *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 314 (6th Cir.2001). Once a prima facie case has been made, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *Id.* at 315. If defendant articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.*

Important for this case, an employer "cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies." 29 C.F.R. § 825.220(c).

Per–Se argues that Sahadi cannot make out a prima facie case because there is no evidence that she availed herself of her FMLA rights. As explained above, there is a genuine issue of material fact on this issue. As such, Sahadi has met this element sufficient to survive summary judgment.

Per–Se also argues that there is no causal connection between the exercise of Sahadi's FMLA rights and the decision to terminate her because Kotwica, who Per–Se says alone had the authority to terminate Sahadi, did not know that Sahadi had exercised her FMLA rights. This argument lacks merit. Sahadi testified that she spoke with Kotwica about needing time off to care for her husband. This creates a factual question not only as to whether Sahadi invoked her FMLA rights, but also whether Kotwica was aware that Sahadi was missing work to care for her

husband. Thus, Sahadi has established this element sufficient to survive summary judgment.

■ Per–Se also argues that "the undisputed record evidence reveals that no FMLA violation occurred because Sahadi was terminated following an unprotected absence." This argument proves too much. Although Per–Se terminated Sahadi after she missed work on December 6, 2001 and she missed work on that day because of her own illness, not to care for her husband, Sahadi was not terminated simply because she missed one day of work. Rather, it was Sahadi's history of absences, which lead to her being placed on probation and culminated with her December 6, 2001 absence, that ultimately led to her termination. Sahadi is arguing that some of her absences, for which she was disciplined (placed on probation) were protected absences and that Per–Se violated the FMLA by using these absences against her in making adverse employment decisions, including her placement on probation and ultimately terminating her. A review of the record above shows that some of the absences that were used against Sahadi, *i.e.* were listed as absences leading to discipline, were absences where Sahadi cared for her husband. These absences are arguably protected. In other words, Sahadi argues that had Per–Se followed the FMLA and not counted protected absences against her, she would not have been in the situation where she was not allowed to take time off unless it was prescheduled unless she had enough hours and where she faced termination for violating her probation. Thus, there is a genuine issue of fact as to whether Per–Se terminated Sahadi in violation of the FMLA because of her protected absences. In other words, a jury could infer that Sahadi was terminated as a result of Per–Se counting her protected absences against her under their attendance policy when they placed her on probation and

ultimately terminated her. This is sufficient to make out a prima facie case for an FMLA violation.

Moreover, even if Per–Se had a legitimate reason for terminating Sahadi following her December 6, 2001 absence, Sahadi has showed pretext. As stated in her letter of termination, Sahadi was terminated because she was told she could not miss work unless she had "banked" sufficient time. Cascante calculated that Sahadi did not have enough hours to take December 6, 2001 off and therefore told Kotwica, who made the decision to terminate Sahadi. However, Sahadi discovered that Cascante was wrong—she did have enough hours to take December 6, 2001 off. When Per–Se realized that this was indeed the case, Per–Se wrote to Sahadi and then explained that her termination was not because she did not have sufficient time but rather because she took time off that was not "prescheduled." As Sahadi points out, she cannot preschedule sick days. Rather, Sahadi followed her prior practice of calling in and telling Cascante that she would not be in that day. From this evidence, a jury could infer that the second proffered reason for her termination was a pretext for retaliation because it is unworthy of belief. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

4. The October 9, 2001 Memorandum

■ At oral argument, the Court raised the issue as to the effect of the October 9, 2001 memorandum on Sahadi's absenteeism. That is, could the October 9, 2001 memorandum constitute a waiver of any FMLA rights Sahadi may have had prior to the memorandum in terms of having

potentially FMLA covered absences counted against her as well as a waiver of rights into the future. Per–Se did not address this concern. Sahadi did. As she points out, the October 9, 2001 memorandum does not mention the FMLA and have no language which could be found to constitute of waiver of Sahadi's FMLA rights. At most, the October 9, 2001 memorandum is further evidence that Per–Se lacked a clear appreciation of the FMLA particularly in regards to intermittent leave. Had Per–Se fully understood the FMLA, it arguably would not have singled out Sahadi's absences to care for her husband against her as part of the reason for placing her on probation.

### C. Breach of Contract Claim

Sahadi's contract claims against Per–Se and Cascante are based on her assertion that the October 9, 2001 memorandum constitutes an employment contract under which Sahadi could only be terminated for cause. Sahadi argues that because the memorandum set forth specific "guidelines" guaranteed to cause immediate dismissal if not followed, she is entitled to protection from discharge for any other reason without just cause.

■ Generally, and under Michigan law by presumption, employment relationships are terminable at the will of either party. *Lynas v. Maxwell Farms*, 279 Mich. 684, 687, 273 N.W. 315 (1937). However, the presumption of employment at will can be rebutted so that contractual obligations and limitations are imposed on an employer's right to terminate employment. *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). *See also Edwards v. Whirlpool Corp.*, 678 F.Supp. 1284, 1291 (W.D.Mich.1987). The presumption of employment at will is overcome with proof of either a contract provision for a definite term of employment, or one that forbids discharge absent just cause. *Rood v. General Dynamics Corp.*, 444 Mich. 107, 117, 507 N.W.2d 591 (1993). Courts have recognized the following three ways by which a plaintiff can prove such contractual terms: (1) proof of "a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause"; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a "legitimate expectation" of job security in the employee. *Neph v. Grimsby*, 2002 WL 31958227, *2 (Mich.App.2002).

Sahadi's employment handbook provides:

I understand that the Employee Handbook is not a contract of employment, express or implied, and that my employment is at will, for no specific period of time and may be terminated at any time by me or Medaphis. No manager or representative has any authority to enter into an employment contract for any specific period or to make any agreement contrary to the foregoing unless approved in writing by the company President.

It is undisputed that the October 9, 2001 memorandum was not approved by the company president. Thus, under the employee handbook, it cannot be said to have created a just cause employment relationship.

■ However, Sahadi nonetheless argues that the October 9, 2001 memorandum is an express contract regarding her job security that is clear and unequivocal, or at least creates an issue of material fact. This argument is misguided. The October 9, 2001 memorandum does not create just cause employment, rather it is a written disciplinary warning and an outline of the strict attendance rules Sahadi must follow

or be terminated. It does not state that Sahadi cannot be terminated for other reasons, which Sahadi acknowledges. The memorandum, as Per–Se points out, is an indication that dismissal is more imminent than remote. The Court finds that there is no genuine issue of material fact as to whether the October 9, 2001 memorandum created a just cause employment relationship between Sahadi and Per–Se. It did not.

### D. Intentional Interference with Employment Contract

This claim is asserted only against Cascante. She says that because Sahadi's employment was at will, there is no contract upon which Sahadi's claim may be based.

Michigan law is not settled on whether an individual may bring an intentional interference with contract claim where their employment is at will. In *Dzierwa v. Michigan Oil Co.*, 152 Mich.App. 281, 287, 393 N.W.2d 610 (1986), the Michigan Court of Appeals stated that "[t]o maintain a cause of action for tortious interference with a contract, a plaintiff must establish a breach of contract caused by the defendant .. and that the defendant was a 'third party' to the contract ..." The court went on to hold that "since plaintiff's employment contract was terminable at will, there could be no breach arising from its termination." *Id.* However, in *Feaheny v. Caldwell*, 175 Mich.App. 291, 437 N.W.2d 358 (1989), the court held that a tortious interference claim may be brought despite an at will employment contract. The court explained:

> [W]hen viewed as a subsisting relationship that is of value to the employee and will presumably continue in effect absent wrongful interference by a third party ... an at-will contract is the proper subject of an actionable tortious interference claim. Under this view, the employee has a manifest interest in the freedom of the employer to exercise his

or her judgment without illegal interference or compulsion and it is the unjustified interference by third persons that is actionable.... the third party must intentionally do an act that is per se wrongful or do a lawful act with malice and that is unjustified in law for the purpose of invading the contractual rights or business relationship of another.... [we] hold that an at-will employment contract is actionable under a tortious interference theory of liability.... The basis of our holding is that an at-will employee who enjoys the confidence of his or her employer has the right to expect that a third party will not wrongfully undermine the existing favorable relationship.

175 Mich.App. at 302–04, 437 N.W.2d 358 (internal citations omitted).

However, one judge in this district has rejected *Feaheny* and followed *Dzierwa*, explaining that

> the basic premise of this reasoning [in *Feaheny* ] is flawed: at will employment will *not* presumably continue in effect absent wrongful interference by a third party. The general rule under Michigan law is that an at-will employee may be terminated *at any time and for any reason.* Therefore, even the absence of wrongful interference by a third party an at-will employee's employment will *not* presumable [sic] continue in effect.

*Carlson v. Westbrooke Serv. Corp.*, 815 F.Supp. 1019, 1023, n. 2 (E.D.Mich.1992) (emphasis in original).

■ The reasoning in *Carlson* is sound. It simply does not make logical sense to allow an intentional interference with a contract claim where there is an at will employment contract.

■ However, even if such a claim could be maintained, Sahadi has failed to make out a claim sufficient to survive sum-

mary judgment. In *Formall, Inc. v. Community Nat. Bank of Pontiac*, 166 Mich. App. 772, 779, 421 N.W.2d 289 (Mich.App. 1988), the court of appeals explained the necessary components of a claim for tortious interference with a contractual relationship as follows:

> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.... a plaintiff must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference..... the interference with a business relationship must be improper in addition to being intentional. Improper means illegal, unethical, or fraudulent.... defendant's conduct be "without justification."

> . . . .

> "[A] 'wrongful act' is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right." ...

> A "per se wrongful act" is an act that is inherently wrongful or one that is never justified under any circumstances.

(internal citations omitted).

Sahadi says that Cascante tortiously interfered with her employment in 1999 by issuing disciplinary warnings to Sahadi regarding performance issues, characterizing them as "disparagement and harassment." There is no evidence that the disciplinary warnings were improper or unwarranted, other than Sahadi's opinion that they were unjustified. Sahadi also says that she complained in writing that Cascante was "ruining [her] career." Such a statement, based on Sahadi's subjective belief, does not amount to intentional interference.

Sahadi also says that Cascante purposefully withheld Sahadi's possible FMLA absences from Kotwica, counted several protected absences against Sahadi, and deliberately incorrectly calculated her "banked" time in order to have her fired. Whether or not Cascante should have known about Sahadi's FMLA rights and have passed them along to Kotwica cannot form the basis for a tortious interference claim where there is no evidence that Cascante had an improper motive.

Overall, although it appears that Cascante and Sahadi had difficulties, these difficulties and Cascante's actions simply do not rise to the level of tortious interference as a matter of law.

## VII. Conclusion

For the reasons stated above, only Sahadi's FMLA claims against Per–Se and PST Services, Inc. continue. Her breach of contract and intentional interference with contract claims are DISMISSED. The Deputy Clerk shall schedule this matter for a status conference.

SO ORDERED.

## Exhibit A

Linda Cascante and I met with Mary Sahadi to discuss her attendance. Mary was written up for excessive unscheduled time off on 5/21/01 and put on 90 day probation with no unscheduled time off for the next three months which would be 8/21/01. We discussed with Mary that since her write up and being put on probation she had violated her probation by leaving early on 6/15, calling in ill on 6/18, 7/20, 7/23 and being short work hours on 7/18. In addition to the above Mary came in late on 9/18, was no show to work on 9/21, left 45 minutes early on 10/8 and did not report to work until 11:30am on 10/9. We explained to Mary that due to her inability to follow the attendance guide-

lines that we would have to terminate her employment. Mary had asked that we give her another chance and that she would improve 100%. We explained to Mary that we would give her one more chance but any deviation from the below guidelines and that she would be terminated. We also addressed with Mary the fact that she has no sick or vacation time left and is not to take anytime unless it is approved and accrued.

The agreed upon guidelines are:

1. Mary must report to work between 6:30 and 8:30am–no later.

2. Mary must make sure that she is working 40 hours a week/80 hours a pay.

3. Mary cannot take any time off except only for what is accrued and the time must be pre-scheduled.

4. Mary cannot write her time manually on her punch sheet. Mary must use the punch clock to record her time.

5. Failure to follow the guidelines or deviate in anyway will result in termination.

We expect Mary to improve 100% as she stated and to report to work on time. It is also Mary's responsibility to make sure that she is working 40 hours a week/80 hours a pay. Mary is to work out any personal issues that are jeopardizing her job.

We have all read and agreed to the above stated documentation and realize that any deviation from the above guidelines will result in immediate termination.

Mary          Sahadi          (employee)
/s/_____Date: 10-12-01

Linda          Cascante          (supervisor)
/s/_____Date: 10-10-01

Tanya          Kotwica          (Director)
/s/_____Date: 10-10-01